No. 12,949.

S. WOLFF, ADMINISTRATOR, vs. THE MUTUAL RESERVE FUND LIFE ASSOCIATION.

SYLLABUS.

1. Suit on a life insurance policy.
2. Clause of policy makes death by the hand of the insured, whether sane or insane, not a risk assumed by the contract.
3. Suicide set up as a defense. Question presented altogether one of fact. The evidence establishing the defense, judgment appealed from is affirmed.

APPEAL from the Civil District Court for the Parish of Orleans. *Theard, J.*

*Solomon Wolff*, Plaintiff and Appellant, *pro se.*

*Denegre, Blair & Denegre* for Defendant and Appellee.

Argued and submitted March 24, 1899.
Opinion handed down May 15, 1899.
Rehearing refused June 12, 1899.

The opinion of the court was delivered by

BLANCHARD, J. The Administrator of the Succession of Harry Goldschmidt brings this action to recover $2500 alleged to be due on a policy of insurance issued by defendant company on the life of the deceased.

The defense is suicide, and is based on the following clause found in the policy, to-wit: "Death of said member, caused by any violation of law, or by his own hand, whether sane or insane, voluntary or involuntary, is not a risk assumed by this contract within three years from its date, nor is disability thus caused such a risk at any time."

The policy is dated July 30, 1896, and the death of Goldschmidt occurred within two months thereafter.

Having established the death of Goldschmidt, plaintiff offered the insurance policy, with proof of death, etc., made out on the blanks of the company and in compliance with its regulations, and rested his case.

The burden of establishing the special defense of suicide being upon defendant company, testimony to that end was introduced, with the result that the case was decided by the trial court in favor of defendant, and plaintiff prosecutes this appeal.

The question presented is altogether one of fact.

Goldschmidt, the deceased, and Joseph Goldstein were acquaintances—perhaps friends.

Both lived at No. 218 Bourbon street, New Orleans, where a boarding house was conducted.

On the night of September 25, 1896, they quarreled and a serious difficulty was then narrowly averted.

Early the next morning as Goldstein, who occupied an apartment on the third floor of the house, descended the stairs, he was suddenly met in the hall-way of the second story by Goldschmidt, who, pistol in-

hand, demanded the retraction of offensive terms applied to him by Goldstein the preceding night.

Declining the demand thus made, Goldstein was fired upon by Goldschmidt, the ball taking effect in the back part of the head.

The wounded man staggered and fell, recovered, and reeling along the hall-way finally fell at the door of the dining room, where he lay for a time prostrate.

Here he was again approached by Goldschmidt, who fired a second shot, inflicting another wound in the head.

The would-be slayer then backed away from the wounded man, down the hall-way to the opposite corner, where he placed the pistol to his head and blew his brains out.

This is the statement of Goldstein, who, while badly wounded, did not lose consciousness, recovered later from his wounds and was called to the stand as a witness for the defense.

He testified positively to having seen the deceased put the pistol to his head and fire the shot which ended his life.

With reference to this witness the judge *a quo* says: "His account of the tragic occurrence is clear and straightforward. He impressed me as being courageous, self-possessed, modest withal, and scrupulously veracious."

We have naught to do with his statement other than that which relates to the death of Goldschmidt.

The latter either shot himself purposely, or accidentally, or was shot by Goldstein.

The theory of the plaintiff is that it was not a case of suicide; that the dead man, if he shot himself at all, did so accidentally; and that, more likely, he was shot by Goldstein in the difficulty between them.

The theory of the defense is that Goldschmidt, having shot and, as he thought, killed Goldstein, in his desperation and with the fear of the law before him, took his own life.

A careful consideration of the evidence leads us to the conclusion that it was a case of suicide.

Goldstein's statement is corroborated by the coroner who reached the house three-quarters of an hour after the shooting, examined the corpse, made inquiry, became convinced it was a case of suicide, deemed it unnecessary to hold a formal inquest, but, nevertheless, saw and examined witnesses informally, and gave a certificate of death by the man's own hand.

Goldstein is further corroborated by Mrs. Rass, the landlady of the house, who testified that, having heard the shots, she came from the rear of the house into the dining room and while passing through the latter on her way to the hall, she saw Goldschmidt standing in the corner of the hall (where the statement of Goldstein placed him); that he was then in the act of falling and did fall; and that she saw a pistol in his hand as he fell and noted it lying near him after he was down.

Other circumstances corroborate Goldstein and they are these: A number of persons were occupants of the house at the time of the shooting. They gathered in the hall and many came from the street, until a crowd had assembled.

Without dissent, it would seem, the fact of suicide was accepted, and the newspapers published it as such.

No accusation of any kind was made against Goldstein.

Blumenthal, who lived in the house and was the intimate friend of the dead man, reached the scene in a few moments after the shooting. He, too, assented without question to the verdict of suicide.

There was nothing to impeach the testimony of Goldstein, except a map or plat of the premises where the tragedy occurred, which was made at the instance of plaintiff. It is sought to show by this that, from the physical difficulties and obstructions in the way, it was impossible for a man lying at the dining room door, where Goldstein fell after being shot, to see a man standing in the corner, down the hallway, where the testimony locates Goldschmidt at the time he is said to have fired the fatal shot which ended his life.

The correctness or incorrectness of this phase of the case was tested by the trial judge, who, at the request of counsel for both litigants, visited the house and viewed the premises. The conclusion he reached was that the contention of plaintiff in this respect is not well founded.

Judgment affirmed.