(99 South. 542)

No. 24856.

CANAL–COMMERCIAL TRUST & SAVINGS BANK v. EMPLOYERS' LIABILITY ASSUR. CORPORATION OF LONDON, ENGLAND.

(March 3, 1924.)

*(Syllabus by Editorial Staff.)*

1. Insurance ⚖➡635—Petition held sufficient under accident policy as alleging cause of death.

In an action on an accident insurance policy, which provided that bodily injuries should include asphyxiation suffered through accidental means, a petition alleging that insured "met his death through accidental and external means by being asphyxiated to death by gas," *held* sufficient.

**2. Insurance ⬧665(5)—Evidence held to sustain finding that death of insured was by accidental gas asphyxiation.**

In an action by the heirs of a beneficiary under accident policy, evidence *held* to sustain a finding that insured met his death by gas asphyxiation, and that the death was accidental.

**3. Insurance ⬧646(7)—Where manner of death doubtful, presumption is that of accident and not suicide.**

While in an action on an accident policy the burden is on plaintiff to show that death was caused by accident, yet where it is doubtful from the evidence whether death was caused by an accident or by suicide, a presumption arises that an accident, and not suicide, was the cause of the death.

**4. Statutes ⬧241(1)—Punitory legislation strictly construed.**

Punitory legislation must be strictly construed.

**5. Insurance ⬧602—Heirs of beneficiary held not entitled to statutory double indemnity in action on accident policy.**

Act No. 310 of 1910, relating to double indemnity under insurance policies, covers policies insuring against loss on account of sickness or accident, and allows recovery thereof only by the assured, and hence, double indemnity cannot be recovered by the heirs of the beneficiary.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by the Canal-Commercial Trust & Savings Bank, tutor of the minors, Richmond and Allain D. Favrot, against the Employers' Liability Assurance Corporation of London, England. Judgment for plaintiff, and defendant appeals, and plaintiff answers the appeal, claiming insufficient relief. Affirmed.

Edward Rightor, of New Orleans, for appellant.

Dart, Kernan & Dart and Lewis R. Graham, all of New Orleans, for appellee.

By Division A, composed of O'NIELL, C. J., and ROGERS and BRUNOT, JJ.

ROGERS, J. In the early morning of February 21, 1918, Henry L. Favrot was found dead in the bathroom of his home in the city of New Orleans. He was insured, at the time, against death by accidental means under a policy issued by the defendant company.

Mrs. Marie Richmond Favrot, wife of the assured, the beneficiary named in the policy, made due proof of loss to the insurance company. Subsequently she died, and her claim was inherited by her two minor children, issue of her marriage with her predeceased husband.

This suit was brought by the dative tutor of said minor children to recover $15,000 double indemnity under the aforesaid policy.

The trial was by jury, who returned a verdict in favor of plaintiff for $7,500. The court had charged the jury that the claim for double indemnity would not lie. Judgment was entered in accordance with the verdict, and defendant appealed. Plaintiff has answered the appeal, renewing its demand for double indemnity.

Defendant first filed an exception of no cause of action, which was overruled. We think the ruling was correct.

Plaintiff alleged that "defendant had issued its policy * * * against death from accidental and external means," and "that said insured * * * met his death through accidental and external means by being asphyxiated to death by gas."

Defendant argues that said allegations are insufficient to state a cause of action, because the policy, in express terms, limits recovery for the death of the insured to the case where said death was due to "bodily injuries sustained solely and independently of all other causes through external, violent, and accidental means." The contention is that the petition does not allege and show that insured's death occurred in the manner required by the policy.

It is provided, however, in section F of the insurance contract that:

"Any one of the following, namely sunstroke, freezing, hydrophobia or *asphyxiation suffered through accidental means* (suicide, whether sane or insane, is not covered) *shall be deemed bodily injuries within the meaning of this policy.*" (Writer's italics.)

[1] Under this definition of the insurance contract itself, the allegation of plaintiff that the insured "met his death by being accidentally asphyxiated to death by gas," is the equivalent of an allegation that the insured had suffered bodily injuries.

It was unnecessary for plaintiff to aver that the injury of insured was caused through violent and external means, for the facts as set forth, viz., accidental asphyxiation by gas, sufficiently disclosed that insured's death was caused by "external, violent, and accidental means."

Death by means of gas asphyxiation is necessarily death out of the usual course of nature—an unnatural death; it is likewise external because it is inflicted by an outside agency. An unnatural death is a violent death. The word "violent" is defined as meaning "unnatural." Verbo, "violent, 2," Century Dictionary and Cyclopedia, vol. VIII, p. 6761, col. 1.

So that plaintiff's allegation of the insured's unnatural death as the result of accidental asphyxiation by gas clearly shows an external and violent agency as the cause.

We find nothing in the case of Feitel v. Fidelity & Casualty Co., 147 La. 52, 84 South. 491, cited by defendant, which is contrary to the views we have herein expressed.

In the cited case plaintiff brought suit on an accident policy awarding benefits for immediate, continuous, and total disability, Neither the allegations of, nor the facts set forth in, the petition showed the disability of plaintiff to have been immediate or that the injury averred (a slight scratch on the finger) was the exclusive cause of said disability. On the contrary, the facts as alleged clearly disclosed that plaintiff's disability did not follow immediately upon his injury.

Upon the overruling of its exception, defendant answered, denying seriatim the allegations of plaintiff's petition.

The issue as made up by the pleadings is exclusively one of fact. The suit being for the recovery under an accident policy, the death of the insured not being in dispute, plaintiff carried the burden of proving said death to have been due to accidental means. The jury, composed of 12 disinterested citizens, unanimously resolved the question of fact in favor of plaintiff. Their verdict was approved by the district judge, who overruled defendant's motion for a new trial. Our examination of the record has not convinced us that the jury and the district judge erred in their findings.

The evidence shows that on the morning of his death the insured arose a little before 6 o'clock, as was his custom, and went to the bathroom, where he engaged in his usual preliminaries for shaving. These, among other things, consisted of placing a pan of cold water, to be warmed, on a small gas plate, or stove, setting upon the washstand. This small stove was supplied with gas by means of a rubber tube connected to an outlet approximately 5 feet from the floor.

About an hour later the wife of the insured was awakened by the strong odor of gas, and upon making an investigation found that it emanated from the bathroom. Upon entering the bathroom she discovered her husband lying face down on the floor. The room was highly charged with gas flowing from the rubber tube above referred to. which had become disconnected from the little gas stove, and was suspended about 18 inches from the floor, with decedent's nose

and mouth in the general direction of the detached end of the rubber tube.

The death of the insured could have occurred only in one of two ways; viz., from natural causes or from gas asphyxiation. If from the latter cause, it was either voluntary or involuntary.

Defendant's theory is that the insured died from natural causes, although throughout the argument made on its behalf runs the suggestion, which was not pleaded, that defendant committed suicide.

In support of the theory that the insured died a natural death, defendant relied upon some experiments which it had caused to be made to establish the lethal dose of carbon monoxide, the well-recognized poisonous element in illuminating gas, and upon some alleged admissions said to have been made by the wife of the insured to an agent or investigator of the defendant company on the day of insured's death.

This evidence, in our opinion, does not establish that the death of the insured was brought about by natural causes, especially when weighed against the countervailing evidence in the record tending to show that the decedent was deprived of his life by gas asphyxiation.

We are unable to place the same value upon the experiments in question as does counsel for defendant. These experiments do not amount to a demonstration. They must be considered, as is any other evidence, simply for whatever aid they may afford the court in arriving at a just conclusion.

The experiments were made more than three years after the death of the insured. They were made in the month of May, whereas the insured died in the month of February. The experimentalist was an engineer, not a gas expert. The subjects of the experiments were a rooster and a rabbit, not a human being. An ordinary room, containing 920 cubic feet, with one door and two windows, and not a bathroom, containing 960 cubic feet, with one door and one window, was used. The gas was permitted to flow from a one-fourth inch pipe, whereas the pipe in the bathroom of the decedent measured three-eighths of an inch in diameter. There was no rubber tube dropped to within 18 inches of the floor, nor were the subjects used for the experiments placed anywhere near the gas jet, nor is it shown that they directly inhaled any of the poisonous substance flowing therefrom. It is not established that the atmospheric conditions were the same; that the gas was composed of the identical constituents and in the identical proportions, nor that the same pressure was being exerted, in May, 1921, as in February, 1918.

As we view it, the experiments and their results were too indefinite and uncertain to be of any probative value in determining the issues involved in the present litigation.

In the afternoon of the day on which the insured died, Mr. F. W. Jones and Dr. W. A. Love, respectively the representative and physician of the defendant, called at the residence of the decedent, where they informed the wife, and Mr. Charles A. Favrot, a brother of the decedent who was present, that decedent held an accident policy in the company represented by them, and that they had called to investigate the case. This was the first intimation that Mrs. Favrot or Mr. Charles A. Favrot had of the existence of such a policy.

In the course of an interview which these representatives of the defendant company sought with the widow, Mr. Jones declares she stated to him that she was satisfied her husband had died in an attack of vertigo, but she had no reason to believe he had suicided. Mr. Jones testified that there were also present at the interview Dr. Love, Mr. C. A. Favrot, and a lady whose name he did not know. Dr. Love, however, did not mention

any such admission when on the stand, nor was he asked in regard thereto. Mr. C. A. Favrot testified that he was present during the whole interview; that in the morning Mrs. Favrot was of the opinion that her husband had died of accidental asphyxiation, and he did not hear her tell Mr. Jones that her husband had died of natural causes. It does not appear that any lady other than Mrs. Favrot was present. Mrs. Favrot herself was dead at the time of the trial of the case.

This testimony of the alleged admission of Mrs. Favrot is of the weakest character, and standing by itself unsupported by the testimony of any other witness cannot be considered by the court.

The evidence, taken as a whole, shows that the decedent was a normally healthy man at the time, much given to outdoor life, being a leader in the Boy Scout movement, in which his young son was actively engaged; that on infrequent occasions he suffered from a slight dizziness of only a few seconds duration. There is nothing, however, to show that he was an habitual sufferer from vertigo, or that he had ever suffered seriously and continuously from it.

[2] A careful examination of all the evidence in the record leads to the irresistible conclusion that decedent met his death by gas asphyxiation. This was the consensus of opinion of all the persons present at the moment of the discovery of the body or who had anything to do with it immediately thereafter.

Mr. Charles A. Favrot, a brother of the deceased, living almost directly opposite across the street, who was called and arrived only a few moments after the discovery of the body, testifies that he found the whole house filled with gas. The testimony of Richmond Favrot, a minor son of the deceased, who was aroused by his mother, is to the same effect. Dr. Cocram, summoned

by telephone, and coming on the scene about 20 or 30 minutes after the accident, detected the gas when he arrived. Dr. De Buys was also sent for, but did not testify on the trial of the case.

Dr. Cocram in his testimony declared that he did not think there was any doubt that death was caused by gas asphyxiation. Dr. C. W. Groetsch, assistant coroner, who died before the trial, examined the body and issued his official certificate setting forth that the cause of death was "asphyxiation by illuminating gas accidental." He further certified "that an autopsy is unnecessary."

The embalmer, licensed and experienced, who assisted the undertaker in preparing the body for burial, described the physical appearance of those who have died from gas asphyxiation; he also described the physical appearance of decedent's body. These descriptions show that the usual signs and indications of asphyxiation were present in the body.

Having reached the conclusion that the insured died from gas asphyxiation, it necessarily follows that it must be determined whether the asphyxiation was brought about intentionally or accidentally.

It is a principle of universal application that suicide is never presumed. Counsel for defendant admits the correctness of the rule in general, but contends that the presumption does not prevail under accident policies. In support of this contention he cites Dodder v. Ætna, 104 Neb. 70, 175 N. W. 651; and Grosvenor v. F. & C. Co., 102 Neb. 629, 168 N. W. 596.

The cited cases are from the Supreme Court of Nebraska. Neither state the broad doctrine as contended for by defendant. Each case was decided upon its own particular facts. In the Dodder Case the court said that the facts testified to by the witnesses inescapably sustained the conclusion that Dodder's death was caused by suicide. In

the Grosvenor Case, where the assured died from the effects of drinking carbolic acid, all that the holding of the court amounts to is that the presumption against death by suicide is prima facie only and rebuttable; that it prevails where the cause of the death is unknown, but does not prevail where the facts adduced are contrary to said presumption or the presumption is met by conflicting presumptions.

[3] The correct rule, and the one to which we prefer to adhere, is stated in Ruling Case Law, vol. 14, § 416, p. 1236, as follows:

" * * * While in an action on an accident policy the burden is on the plaintiff to show that death was caused by accident, yet where it is doubtful from the evidence whether death was caused by an accident or by suicide, a presumption arises that an accident, and not suicide, was the cause of the death."

And also at page 1237, section 417 of the same volume, we find this statement of the law, viz.:

"The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption."

The facts surrounding the death of the insured in the case at bar not only militate against the suicide theory, but seem to point conclusively to an accidental death.

So far as the record discloses there was an entire absence of motive which would have caused the decedent to take his own life. He was successful as a practicing lawyer, happily married, living in his own home, the father of two interesting children. His social and domestic environment was excellent. No pecuniary embarrassment is suggested. The evening previous to his death he was in his yard playing with his children, and had actually arranged with his 14 year old son to arise early on that morning in order to go out and work in a garden used by the Boy Scout organization.

[4, 5] Beyond all this, the position and the condition of the body when found conclusively demonstrates that the death of insured was accidental and not intentional.

Under its answer to the appeal, plaintiff has prayed for an award for double indemnity. The claim is made by virtue of the provisions of Act No. 310 of 1910. We do not think the statute is applicable to the present case. It is punitory legislation, and must be strictly construed.

The statute in express terms only covers policies "insuring any person against loss on account of sickness or accident" (section 1), and the "assured" is the one to whom recovery is due. In the case at bar the claim is being asserted by the heirs of the beneficiary, and not by the assured.

We see no error in the judgment appealed from.

Judgment affirmed.