## BAYLES v. JEFFERSON STANDARD LIFE INS. CO.
### No. 4413.

Court of Appeal of Louisiana. Second Circuit.

June 5, 1933.

Shotwell & Brown, of Monroe, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellee.

TALIAFERRO, Judge.

On April 26, 1922, defendant company issued a policy of life insurance to Basil Bayles, of Union parish, La., for $1,000, insuring his life for the period of one year, with H. G. Bayles, father of the insured, named as beneficiary. The policy contains a "double indemnity" provision whereby the defendant agreed to pay the beneficiary an amount equal to double the face of the policy if, while it was in effect, the death of the insured resulted from bodily injury within 90 days after the occurrence of such injury, provided death resulted directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental means, while the insured was sane and sober, etc. The following provision is also incorporated in the policy:

"In case of self-destruction committed, whether sane or insane, within one year from the date herein, the extent of recovery hereunder shall be the premium paid."

466

The beneficiary, H. G. Bayles, brought this suit on March 4, 1932, to recover double the face of the policy, or $2,000 and interest, alleging that his son, the insured, was killed on April 6, 1923, while said policy was in force, by virtue of a pistol being accidentally discharged. The giving of timely notice of death to defendant and request for regular forms for filing proof of death is alleged. These were refused, and on May 16, 1923, it is further alleged, defendant, without just cause, denied liability and declined to pay plaintiff any amount in excess of the first premium paid on the policy.

Defendant admits the death of the insured, as alleged, but denies that his death fell within the "double indemnity" provision of the policy, and denies that insured was killed accidentally, but, on the contrary, avers that he committed suicide within one year after issuance of said policy on his life, and therefore nothing is due by it under the terms of the policy, except the premium paid. This amount, with interest and court costs to time of commencement of trial of the case, it is admitted, was tendered to plaintiff before the trial began.

Defendant prays that plaintiff's demands be rejected, except as to $27.52, with interest, being the premium paid by deceased. In the alternative, it prays that in the event any recovery whatever should be had under the policy, other than the return premium, such recovery should be limited to $1,000.

There was judgment in favor of plaintiff for $27.52, with 6 per cent. per annum interest from May 16, 1923, until May 26, 1932, date of tender, with costs accrued to that time. In all other respects, plaintiff's demands were rejected with costs. This appeal is prosecuted by plaintiff.

The pivotal question in the case is whether the insured took his own life. The case was fought out primarily on this issue in the lower court after the insured had been dead over nine years. The trial judge decided that the defense of suicide had been established and, as death occurred within one year from date of the policy, no recovery thereunder could be had beyond the amount paid as premium.

On the morning of April 6, 1923, Basil Bayles, the insured, accompanied by R. B. Henry, a brother-in-law, drove to the store of one Jim Aulds, not many miles from the farm and home of plaintiff, and on entering the store asked Aulds to sell him some cigarettes, and, as Aulds turned to reach for the cigarettes, Bayles, at close range, fired four shots at him, three taking effect, producing death almost instantly. Bayles re-entered the car, driven by Henry, and proceeded towards his father's home, picking up his sister, Lillie Bayles, on the way. Arriving at plaintiff's home, Bayles and his sister got out of the car, while Henry drove off. No quarrel or angry words preceded the shooting of Aulds, and, so far as the record reveals, the crime was deliberate and unprovoked. The slayer did declare immediately after the homicide that Aulds had threatened his life and he had to kill him, and in the same breath declared he intended to kill another man by the name of Guyce.

When young Bayles and his sister entered their father's home, the latter broke the news that Aulds had been slain by her brother, and, as might be expected, considerable confusion, and discussion of the matter among the members of the family and others present, ensued. Naturally it was expected that the sheriff of the parish would soon be in search of young Bayles to arrest him. An effort was made to induce Basil to give up his weapon and surrender to the authorities, but he declined to consent to do either, stating he would not submit to arrest. It was then his father told him he would have to leave the place as he did not want any trouble there. Plaintiff and his son, the insured, left the house and walked down to the barn, over 40 yards distant, and returned. What was said or done by either on this trip is not disclosed by the record. The father was not interrogated thereon and no other person was present. Then deceased and his younger brother, Christy, left the house and went to or near the barn. Christy returned to the house, leaving Basil some 30 or 40 steps therefrom, and after the lapse of a few minutes, possibly not so long, a shot was heard in the direction of the barn, and he and others present rushed out in that direction and found Basil at length on the ground with a bullet hole in his forehead, to the left of the center thereof, and about midway between the left eyebrow and the hair line. It penetrated the head, making its exit at a point on a level with the point of entrance. His feet were about two feet from the lot fence, and his head and shoulders four feet therefrom. He was lying partly on his stomach and left side, with his left arm partly under his body and his right hand over or on his head and face. There is dispute as to the exact location of the pistol, with reference to the body. The first person reaching the body, Johnnie Reeves, says it was against his side and left arm, while Christy Bayles says it was midway between the head and the fence. One exploded pistol cartridge was found near the body, and one unexploded remained in the gun. There were no eyewitnesses to the tragedy. Johnnie Reeves says he and Roy Bayles, brother of deceased, age ten and twelve years, respectively, at the time, were peeling onions in plaintiff's garden, and he testified that he saw deceased and his brother, Christy, talking in the lot immediately before Christy went into the house, and when he heard the shot, he could dimly see the body going down slowly behind the (garden) picket fence. Roy Bayles did not testify in the case.

The pistol that killed Aulds and Basil Bayles was a 32-caliber German make. The wound on deceased's head, at the point of entrance of the bullet, was smooth, round, described by several witnesses as being about the size of a pea. The wound at point of exit was larger. Whether there were powder burns or tattoo marks about the front wound has been discussed at length and many witnesses, who viewed the body of the insured before and after it was prepared for burial, testified specifically on this question. Plaintiff contends, in support of his position that the insured met death by accidental discharge of his weapon, that there was complete absence of such burns and marks, while defendant insists that such were present. Plaintiff and five witnesses testified that there were no powder burns or tattooing about the wound, while a greater number gave evidence for defendant directly contradictory of this testimony on behalf of plaintiff. Plaintiff's witnesses were his sons and cousins, while those who testified for defendant were plaintiff's neighbors and long-time acquaintances. The record discloses no reason nor suggestion why their testimony should not be accepted at face value. Among these witnesses for defendant was a deputy sheriff who, having heard that deceased had killed Aulds, went to plaintiff's home to make arrest. He viewed the body closely and was positive that there was a powder burn encircling the wound about the size of a half dollar. We think, and hold, that the evidence establishes with reasonable certainty that there were powder burns about the wound on deceased's forehead. Certainly it preponderates in favor of that conclusion.

The materiality of the presence or absence of powder burns about a gunshot wound bears upon the important question of the distance intervening between the muzzle of the gun and the point of entrance of the bullet. Beyond a certain distance, dependent upon the character of weapon, a gunshot will not register powder burns upon the flesh, and, within certain distances, it will do so.

Plaintiff theorizes that because, as he contends, no powder burns were noticeable about the wound on his son's forehead, the weapon, when discharged, was farther from his head than the arm's length, and, therefore, must have fallen to the ground and fired, or must have been thrown against the nearby fence or other object and discharged, in an effort to get rid of it. The fact that deceased refused to surrender the pistol to his father, and others who requested him to do so, argues strongly against the theory that he attempted to throw it away. The proximity of the gun to deceased's body, after he had fallen to the ground, negatives the theory that it had been thrown against the fence. This fence is shown to be constructed of parallel boards, nearest the ground, nailed to posts with two strands of barbed wire above the boards. The bullet having gone through the head on a level, straight line, makes it certain the pistol, when fired, was pointed towards the forehead on a line level with the course of the bullet, or else it was in a position below and perpendicular to and pointing towards the forehead when fired. This latter position would have been barely possible, but improbable. It is possible the gun could have fallen from the pocket or hand of deceased and struck on its butt, or handle end, with the barrel pointing up, and fired while in this position, as deceased, in the effort to pick it up, bent forward with face towards the ground. But, when we consider the weight of the pistol and the inappreciable interval of time for it to fall two or three feet, it seems obviously improbable that an accident could have happened in this way; and again, had it so happened, the body would have likely been in a crumpled position, or, if at length, with the front of the face and stomach against the ground.

The evidence of Johnnie Reeves supports the conclusion that deceased was standing erect when the pistol fired. The position of the body and limbs, when first seen, after the shot was fired, also supports this theory. There remains but one other theory, with respect to the position and location of the pistol when it fired the bullet into Bayles' head, to be considered. That theory is that the gun was in the hand or hands of deceased when fired. We think it has ceased to be a theory, but has evolved, in view of the undisputed evidence, circumstances and rational inferences arising therefrom, into an established fact that the pistol was held by deceased when it discharged the shot that ended his life. Whether one or both hands held the gun when fired is not material. Whether the firing of the pistol was accidental or intentional, of course, is material. If the pistol was held in the hand or hands of deceased when it fired, and we have reached the conclusion that it was so held, whether it was fired intentionally or accidentally, powder burns and tattoo signs should have been easily noticeable about the wound. The fact that the powder burns covered a small circular area around the wound, with tattooing therein, is convincing proof that the muzzle of the pistol was close to the head when fired. The powder, exploded and unexploded, had not the time or distance to cover, to spread over a larger area.

"And where the course of the bullet made it certain that the revolver, when discharged, must have been pointing toward the right temple, and in line with a plane passing through the brain of the insured, the court said that this fact 'irresistibly suggests that it must have been held in deceased's own hand when fired.' Voelkel v. Supreme Tent, etc., 116 Wis. 206, 92 N. W. 1104." 17 Ann. Cas. p. 36 note.

If the pistol was accidentally discharged, we are unable to conceive why or for what reason or purpose it was held in the position necessary to be held, in, to send the bullet on a level through the head. This position placed the gun above the level of the eyes, and made it impracticable of inspection, if such were being attempted. No one, for the purpose of disengaging parts of such a weapon, or of disassembling the entire weapon, would hold it on a line or level with the forehead, when, if seen at all, would require the eyes to be cast upward. Deceased would not have been examining the weapon then to inform himself of its mechanical efficiency, because within an hour before, he had tested it out on Aulds. There seems to us but one rational inference to draw, and deduction to make, from the physical facts immediately bearing upon the death of Bayles, and which are supported by other facts and circumstances in the case, and that is that he intentionally fired the shot that brought his life to an end.

"The fact that the pistol was held at right angles with the head when discharged, and that the deceased was standing upright, as indicated by the manner in which he lay when found, destroys utterly the presumption of accident, because of the impossibility, to say nothing of improbability, of the firearm getting, by any other means than that of design, into the requisite position to cause the wound as it was caused. Agen v. Metropolitan Life Ins. Co., 105 Wis. 217, 80 N. W. 1020, 76 Am. St. Rep. 905." 17 Ann. Cas. 36 note.

There is a legal presumption against self-destruction, or suicide. The desire to live, and the natural disposition of every one to shrink from death, is axiomatic. When suicide is offered as a defense to a suit on a policy of insurance, the burden of proof is upon the insurer to establish that defense with reasonable certainty, when the proof consists of circumstantial evidence only.

In Leman v. Manhattan Life Insurance Co., 46 La. Ann. 1189, 15 So. 388, 24 L. R. A. 589, 49 Am. St. Rep. 348, where the defense was that the insured committed suicide, the court lays down the rule to be:

"In such actions, when the defense is self-destruction, the burden of proof is on the insurer to establish the suicide; and when circumstantial evidence, only, is relied on, the defense fails, unless the circumstances exclude, with reasonable certainty, any hypothesis of death by accident, or by the act of another. Bliss, Ins. §§ 366, 367; Mallory v. Insurance Co., 47 N. Y. 52 [7 Am. Rep. 410]; Phillips v. Insurance Co., 26 La. Ann. 404 [21 Am. St. Rep. 549]."

This doctrine was affirmed in Daughtry v. Knights of Pythias, 48 La. Ann. 1203, 20 So. 712, 55 Am. St. Rep. 310; Boynton v. Equitable Life Assur. Soc., 105 La. 202, 29 So. 490, 52 L. R. A. 687; Valesi v. Mutual Life Ins.

Co., 151 La. 406, 91 So. 818; Canal-Com. Tr. & Sav. Bank v. Employers' Liability Assur. Corp., 155 La. 720, 99 So. 542; Faulk v. Mutual Life Ins. Co., 160 La. 529, 107 So. 395.

The rule announced in all these cases is that the degree of proof of suicide required to overcome the presumption against suicide was that it must exclude every other "reasonable hypothesis" as to the manner and cause of death. "Reasonable hypothesis" means, or is the equivalent of, moral certainty. The idea intended to be conveyed is similar to, but not exactly the same as, that conveyed in "reasonable doubt" beyond which the jury in criminal cases must be convinced before rendering a verdict of guilty. If the circumstantial evidence in support of a theory of suicide is sufficiently strong to produce in the mind of the judge or jury moral certainty that deceased did take his own life, then the requirements of law are met, when it declares that such evidence must exclude every reasonable hypothesis other than that death was self-inflicted.

In 14 Ruling Case Law, par. 417, p. 1237, the prevailing rule as to the weight and sufficiency of the evidence in support of the defense of suicide is stated to be:

"The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption. In reaching their conclusions as to whether a person has committed suicide, courts are not tied down by the rigid rules of the criminal law, but are authorized to act upon circumstantial, as well as direct, evidence. The quantum of evidence which is essential to overcome the presumption of suicide has been variously adjudicated. It has sometimes been said that there should be a preponderance of evidence, and again that the presumption against suicide easily yields to physical facts clearly inconsistent with it. The consensus of opinion, however, is that when circumstantial evidence is relied upon to establish death by suicide, the party making the averment must prove it by facts which exclude every reasonable hypothesis of natural or accidental death."

It is recognized by all authorities on the subject that in cases involving the question whether the deceased killed himself purposely, and the evidence is circumstantial, that motive for so doing is a pertinent factor and oftimes its existence or lack of existence turns the scales against or in favor of the theory of suicide. In cases where the balance is even as to whether death was accidental or intentional, establishing a motive for self-destruction overcomes the legal presumption, always present, against such act on the part of the deceased. Webster v. New York Life Insurance Co., 160 La. 854, 107 So. 599.

■ The motive for Basil Bayles taking his own life abundantly appears in this record. He had just committed an unprovoked and deliberate murder, and knew the agents of the law would soon be on his trail. According to his own statement, within 30 minutes before he died, he had determined not to face a court for trial, nor suffer imprisonment for the transgression of the laws of his country. His father had virtually ordered him to leave the family home to avoid the trouble that would follow a refusal to submit to arrest.

Christy Bayles testified that while he and deceased were in the barn lot, immediately preceding the tragedy, it was agreed that they would leave that part of the country at once and go to New Orleans and other places. He states that deceased had requested that he secure some cash money from their father on a check Christy had, which he was in the act of doing when he heard the shot; that Basil had also requested that a suit of overalls be brought him from the house, and that Christy bring his own pistol with ammunition for it and Basil's weapon. This testimony is relied upon by plaintiff to show that immediately before the shot was fired, Basil had a fixed intention of fleeing the country and did not contemplate suicide. Why Basil remained out of the family home, while his brother returned to it for the purposes above mentioned, we are left only to conjecture. No doubt his mind was overwhelmingly depressed at the time because of his unhappy predicament, and when alone to reflect upon his condition, there is little doubt the thought of becoming a perennial fugitive from justice and an exile from the family fireside, impelled him to take the tragic step.

In the case of Webster v. New York Life Insurance Co., 160 La. 854, 879, 107 So. 599, 608, supra, the court, commenting on the question of motive for suicide, says:

"Likewise again, where the deceased kills himself immediately after committing or attempting (with near success) a homicide on another, or whilst fleeing pursuit after the commission of some high crime, the presumption against suicide is overcome, because the motive is self-evident."

And in Wolff, Adm'r v. Mut. R. F. L. Ins. Co., 51 La. Ann. 1260, 26 So. 89, the fact that the insured had, immediately before taking his own life, shot his former friend and thought he had killed him, and the fear of punishment for the deed, were considered sufficient motive for the suicide.

"The fact that the insured was not in trouble of any sort has a tendency to show that the act producing death was not intentional." 17 Ann. Cas. 38.

"On the other hand, the fact that the insured had committed a crime and had been placed under arrest, or apprehended arrest, tends to show that the killing was intentional." 17 Ann. Cas. 38.

■ Defendant complains of the lower court's ruling on the admissibility of the testimony of Dr. C. P. Gray. Dr. Gray did not see the body of young Bayles after his death, and, therefore, gave his opinion, as an expert, largely in response to hypothetical questions to him. It was his opinion that in view of the fact that there were no powder burns or tattoo signs about the wound on deceased's forehead, and that the location of the wound itself was not where suicides usually inflict them, that death was caused by accident. Since we have reached the conclusion that the evidence shows there were powder burns and tattoo marks about the front wound, Dr. Gray's opinion that the weapon, when fired, must have been too far from deceased's head to have been held in his hands, loses its force.

■ Whether death is self-inflicted or not is a question of fact to be determined by judge or jury from all the evidence in the case. It is the province of the judge or jury to arrive at a conclusion on the question of fact without resort to science or expert testimony. An expert, such as a physician, could give evidence as to the necessary position of the hand holding a pistol in order to produce a wound in a given location, but it falls without the domain of such expert to say whether the act of shooting, under such circumstances, is accidental or intentional.

The following taken from the Webster Case, supra, is enlightening on this subject:

"It is therefore clear that in a suit on a life or accident insurance policy, where the defense is that the deceased committed suicide, there is but one issue to be resolved, and that is: Do the facts and circumstances proved exclude with reasonable certainty any hypothesis of death by any other means?

"But that is a question of fact, because, like the question of what is the proximate cause of an injury, it is not a question of science or legal knowledge, but each case must necessarily stand on its own particular facts and circumstances. And, if a proposition so self evident need derive any support from authority, we find it in Milwaukee, etc., Ry. Co. v. Kellogg, 94 U. S. 469, 474 (24 L. Ed. 256), wherein the court said:

"'The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.'

"See, also, the authorities collected in Rose's note to page 474 of the official report; and see Modern Woodmen Accident Ass'n v. Shryock, 74 N. W. 610, 54 Neb. 261, 39 L. R. A. 826."

■ Defendant also complains of the ruling of the lower court in sustaining objection on part of plaintiff's counsel to a question propounded by defendant's counsel to practi-

cally every lay witness who testified in the case, of the following purport: Was it not generally conceded by the deceased's family, by the plaintiff himself, and by every one there at the time, and was it not generally understood in the country, that Basil Bayles had committed suicide?

It is not necessary to a decision of this case that we pass on this question. However, under the circumstances, we think the question permissible and that the witnesses should have been allowed to answer it. Such testimony has been considered and given weight in at least one case before the Supreme Court, where the intervening time between death and trial of the case was negligible compared with that in the present case.

Such testimony would not be conclusive of the fact, but would be proof of a circumstance in the case corroborative of the theory of suicide, and if the beneficiary shared such opinion for such a long period of time, it would certainly have material bearing upon the sincerity of his change of position, as reflected by his suit to recover the insurance. This character of evidence was considered in the case of Wolff, Adm'r v. Mut. R. F. L. Ins. Co., supra, wherein the following language was used by the court:

"Goldstein's statement is corroborated by the coroner, who reached the house three-quarters of an hour after the shooting, examined the corpse, made inquiry, became convinced it was a case of suicide, and deemed it unnecessary to hold a formal inquest, but, nevertheless, saw and examined witnesses informally, and gave a certificate of death by the man's own hand. * * *

"Without dissent, it would seem, the fact of suicide was accepted, and the newspapers published it as such."

It is shown that plaintiff declined to follow the suggestion of a deputy sheriff that an autopsy be held over the body of his son, stating that he was satisfied as to the cause of death.

It appears that within a short time after the death of the insured, plaintiff consulted a reputable attorney in the city of Monroe about his rights under the policy in question. It does not clearly appear what this attorney's intentions were with respect to suing on the policy. He was taken ill and was out of active practice for over one year, and died. The matter continued to remain dormant until May, 1929, when plaintiff's present counsel, a partner of the first one consulted, wrote defendant a letter wherein he says:

"Mr. H. G. Bayles, who is beneficiary under the above styled policy, has again consulted with us relative to the amount due under the above policy."

Other correspondence passed between counsel and defendant, ending in June, 1929. This suit was filed in March, 1932. It is urged by defendant that the unusual delay in pressing this matter to a close is indicative of a lack of confidence in the merits of the demand, and strongly persuasive of the correctness of its contention that plaintiff and all others having first-hand information were of the opinion and belief from the beginning that the insured committed suicide. The demand is somewhat stale, and plaintiff's inaction does reflect a lack of confidence in his right to recover as beneficiary under the policy; but this would not preclude recovery if the evidence otherwise established his right to do so.

Judgment affirmed.