|, BAGNERIS, Judge.
This controversy arises out of an action by Gwen Zanca, the mother of the deceased Todd Zanca, Exide Corporation (“Exide”) and the Life Insurance Company of North America (“LICNA”), defendants, for the proceeds of an accidental death policy. Exide and LICNA paid and processed Todd Zanca’s life insurance benefits but refused to pay the accidental death benefits arguing that Mr. Zanca’s death was a suicide which precluded payments of benefits.
FACTS
On the evening of January 27, 1997, Todd Zanca went out with some friends to a bar in Chalmette, Louisiana. Shortly, before midnight, Mr. Zanca and his friend *3 Chris Nastasia left the bar with Grace Nunez and Nicole Matherne. They followed Ms. Matherne home and Ms. Nunez got into the vehicle with Mr. Zanca and Mr. Nastasia. They then drove back to Chalmette on La. Highway 46.
Along a one mile stretch of the highway that passes through a dark, unlit section of the road, shaded by oak trees, Mr. Zanca’s vehicle skidded, went off the 1 ¿road, striking a tree, and spun around blocking one of the two lanes of travel. Mr. Zanca and Mr. Nastasia got out of the vehicle and Ms. Nunez remained in the car.
Sometime later, after the accident, Rocky Tomasso drove down this same road in his pick-up truck. He did not see Mr. Zanca’s vehicle in the road and he hit it broadside; the truck rolled over Mr. Nastasia and then the truck veered off the road and ran head on into a tree. Mr. Nastasia died instantly and his body was found lying in the middle of the road. Mr. Zanca’s body was lying on the ground near his vehicle. Ms. Nunez was found, seriously injured in the right front seat of Mr. Zanca’s vehicle.
Mr. Zanca was employed by Exide and had obtained a life and accidental death policy through his employment. Gwen Zanca was named beneficiary of an accidental death policy issued on the life of her son, Todd Zanca. Exide and LICNA paid and processed Mr. Zanca’s life insurance benefits, but refused to pay the accidental death benefits. Mrs. Zanca filed suit against Exide and LICNA to recover $30,000.00 in basic accidental death and dismemberment benefits and $200,000.00 in voluntary accidental death and dismemberment benefits.
On October 12-14 and November 9, 1998, the matter went to trial. The trial court took the matter under advisement. On November 25, 1998 the trial court rendered judgment in favor of Exide and LICNA. Mrs. Zanca appeals the judgment of the trial court.

DISCUSSION

On appeal, Mrs. Zanca contends the trial court erred in rendering judgment in favor of the defendants finding that Mr. Zanca’s death was suicide and not a murder.

U STANDARD OF REVIEW

A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). In Mart v. Hill, 505 So.2d 1120 (La.1987), the Louisiana Supreme Court set forth a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Id. at 1127.
This test dictates that the appellate court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. Id. The appellate court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Arceneaux v. Domingue, 365 So.2d 1330 (La. *4 1978). However, where documents or objective evidence, is so contradictory to the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder | ¿would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this court has emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ” Housley v. Cerise, 579 So.2d 973, 976 (La.1991), (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court recognized that “[t]he reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.” Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
This is not to suggest, however, that courts of appeal are not required to review findings of fact by the trial court. To the contrary, as the Supreme Court stated in Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, pp. 8-9 (La.7/5/94), 639 So.2d 216, 221:
Notwithstanding the Court’s earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La.1993), it was not our purpose in that case to mandate that the trial court’s factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the courts of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decidéd it differently, |sthe court of appeal should affirm the trial court where the latter’s judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evi-dentiary support. (Notes omitted)
Mrs. Zanca argues that the accidental death policy in question did not contain the term accidental nor did it provide any exclusion for intoxication or homicide and as such a death due to homicide or related to alcohol comes within the coverage of the policy.
In Canal-Commercial Bk. v. Employer’s Liability Assurance Corp., 99 So. 542, 155 La. 720, (1924), the Louisiana Supreme Court opined:
***While in an action on an accident policy the burden is on the plaintiff to show that death was caused by accident, yet where it is doubtful from the evidence, whether death was caused by an accident or by suicide, a presumption arises that , an accident not suicide, was the caused of death. The presumption against suicide will stand and be decisive of the case until overcome by testimony, which shall outweigh the presumption.
In order to avoid liability on a policy issued by it, if an insurance company relies on the defense that the insured committed suicide, the burden rests on the company to establish that the insured did commit suicide to the exclusion of every other reasonable hypothesis. Kohlman v. New York Life Ins. Co., 151 La. 607, 92 So. 132 (1922); Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 So. 818 (1922). In weigh *5 ing the evidence due consideration should be given to the strong presumption that exists against self-destruction. If, however, after giving due weight to that presumption, and after considering the evidence, it should be found that no other reasonable conclusion can be reached except that the insured took his own life, then there remains nothing for the courts to do, but to hold that the insured did so, and, to sustain the defense of suicide, when suicide may be urged as a defense 1 fiunder the provisions of the policy. Eckendorffv. Mutual Life Ins. Co. of New York, 97 So. 394,154 La. 183, (1923).
It is therefore clear that in a suit on a life or accident insurance policy, where the defense is that the deceased committed suicide, there is but one issue to be resolved, and that is: Whether the facts and circumstances proved exclude with reasonable certainty any hypothesis of death by any other means.
But that is a question of fact, because, like the question of what is the proximate cause of an injury, it is not a question of science or legal knowledge, but each case must necessarily stand on its own particular facts and circumstances. And, if a proposition so self evident need derive any support from authority, we find it in Milwaukee, etc., Railway Co. v. Kellogg, 94 U.S. (4 Otto) 469, 474 (24 L.Ed. 256) (1876), wherein the court said:
“The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.”
We note that each case stands on its own particular facts and circumstances, no one case can serve as a complete precedent for, and be decisive of, another, but can only serve as a guide, pointing out some general rule applicable to one or more of the circumstances to be found in the case then under consideration. For it is clear that no two such cases ever present all case. the same circumstances in each
The courts have previously looked to the following circumstances in order to determine whether the deceased came to his death by suicide or otherwise. Among these circumstances are: (1) Physical circumstances attending death, such as time, place, means of death, position of body, nature of wound, and the like; (2) preparations for death, statements, letters, and previous attempts at suicide; and (3) 17motive, if any, touching with attention should be paid to age and health, habits, disposition and temperament, domestic and social relations, pecuniary circumstances, and the like. However, these circumstances do not purport to exhaust the whole category of relevant circumstances, and, of course, do not even approach doing so. See generally, Webster v. New York Life Ins. Co., 107 So. 599, 160 La. 854 (La.1926).
In the ease at bar, Christopher Nastasia died immediately when he was struck by the truck driven by Rocky To-masso. Grace Nunez suffers from amnesia and cannot remember anything from the time she was in the bar with Todd Zanca and Christopher Nastasia until she woke up in the hospital. Rocky Tomasso lost consciousness during the truck collision and does not remember anything.
At trial, Dr. Paul McGarry, a Forensic and Neuropathologist performed the autopsy on Todd Zanca and Christopher Nastasia. At trial, Dr. McGarry testified that he examined the body of Mr. Zanca and he observed numerous scrapes, bruises, and cuts on the back of his hand, forearm, elbows, and knees. He also had a small cut on his right forehead at the hairline and two small cuts on his right brow. Mr. Zanca had small superficial bruises and abrasions of the knees and lower thighs.
Dr. McGarry testified that Mr. Zanca had gunpowder and fine blood spatter on the back of his hands. There were soot *6 stains inside his mouth and lacerations of the mucus membrane. Mr. Zanca had lacerations on the inside of his cheeks, which was caused by the explosion of the bullets in his mouth. Dr. McGarry opined that this indicated that Mr. Zanca’s lips were closed around the gun when it was fired. He rejected the theory that Mr. Zanca was murdered, and concluded that | sit was extremely unlikely that Mr. Zanca’s death resulted from anything other than suicide.
Dr. McGarry testified that the gunshot entered the center of the hard palate, an inch and a half behind the teeth, two inches behind the teeth, two inches behind the closed lips. The path of the gunshot went from the palate upward, backward forty-degree and leftward fifteen degrees, perforating the brain. The bullet was discovered at the end of the track that perforated the brain. McGarry testified that the cause of Mr. Zanca’s death was a gunshot wound of the palate. He testified that the gun was placed in the mouth and fired against the palate causing the massive damage to the brain.
The toxicology report on Mr. Zanca’s blood showed that his blood alcohol level was 0.29 percent. No barbiturates or ben-zodiazepines were found in the blood of Mr. Zanca. The chemical analysis of Mr. Zanca’s urine was negative for any controlled substance and alkaloids. Dr. McGarry testified that Mr. Zanca was legally intoxicated.
Dr. McGarry testified that he found blood in Todd Zanca’s ear canal. The explosion of the gunshot caused the blood in the ear canal, which was directly against the palate. The bullet went into Mr. Zan-ea’s head, fractured the bones of the head, fractured the basal bones, went inside the side of the skull, the brain tissue extruded throughout the ears, perforated and interrupted the middle bone, and the brain tissue in the nasal cavity.
Dr. Robert Tiel, a Neurosurgeon, reviewed the autopsy report, and the coroner’s report that was conducted on Mr. Zanca. He also reviewed photos from the scene of the accident, summaries of deposition and the toxicology report! He testified that Mr. Zanca’s death was instantaneous and was caused by the gunshot |flto the brain. There was a massive increase in his intracranial pressure almost instantaneous cerebellopontine herniation, which pushed the brain stem down causing the respiratory and vital functions to fail and cause death within a few heartbeats.
Dr. John W. Thompson, Jr., an expert in Forensic and Addiction Psychiatry, conducted a “ Psychiatric Autopsy.” Dr. Thompson testified that Mr. Zanca had the motive to commit suicide. This motive was created by three “stressors”, the death of Christopher Nastasia, the recent death of his Father, and the fact he was intoxicated at the time of the accident. Dr. Thompson testified that this motive existed whether or not Mr. Zanca was driving the car or not.
Dr. Thompson testified that Mr. Zanca had the mental capacity and the intent to understand his actions that he was ending his life by placing a loaded gun into his mouth and pulling the trigger, although his blood alcohol level was .29. He opined that Mr. Zanca had the ability to drink a lot without appearing intoxicated and he had a high tolerance for alcohol. Dr. Thompson concluded that Mr. Zanca understood what was going on because of his behavior throughout the night and the way people described him. He testified that Mr. Zanca’s blood alcohol level would not have impaired him so much that he would not be able to appreciate the consequences of his action that night. He testified that Mr. Zanca was in touch with reality when he placed the gun in his mouth and pulled the trigger.
In the instant case, the motive for the unfortunate act was clearly established. Dr. Thompson testified Mr. Zanca had the motive to commit suicide. Dr. McGarry conclusively ruled Mr. Zanca’s death was a suicide based on the evidence he obtained after performing the autopsy on Mr. Zan- *7 ca’s body. Further, | inthe' evidence clearly shows that Mr. Zanca took his life intentionally. Mr. Zanca could have met his death in but three ways, by being murdered, by accident, or by his own act. The evidence clearly shows that he was neither murdered or that this was an accident.
Mr. Zanca had soot on both his hands and mouth, the gun was near his body within arm length and the gun belonged to him. Dr. McGarry testified that the soot on the hands and mouth were consistent with suicide. Further, the spent pellet removed from Mr. Zanca’s head was tested for ballistics by the Louisiana State police Crime Lab. The result revealed that the pellet removed from Mr. Zanca’s head was fired from the gun found near his body.
Therefore, after considering and reviewing the entire record, we find the evidence presented and taken as a whole exclude the hypothesis the Mr. Zanca was murdered. Thus, the trial court was correct in rejecting the homicide theory.

CONCLUSION

Accordingly, we affirm the trial court judgment. It is further ordered that the Motion to Quash filed by the Defendants be hereby granted.

AFFIRMED.