No. 4101

Second Circuit

WEST v. LIFE & CASUALTY INS. CO. OF TENNESSEE

(March 16, 1932. Opinion and Decree.)

Bryan E. Bush, of Shreveport, attorney for plaintiff, appellant.

C. F. Currier, of Shreveport, attorney for defendant, appellee.

McGREGOR, J. On March 28, 1930, the defendant issued an intermediate twenty-payment life policy for the sum of $500. The name of the insured was Jeff Nash, and the beneficiary designated was Edna West, the plaintiff herein, who was described in the policy as being the daughter of the insured.

On April 9, 1930, Jeff Nash died, and in due course of time, on June 17, 1930, Edna West prepared and mailed to the defendant the usual proof of death on printed forms evidently furnished to her at her request. Payment on the policy was refused, and this suit to collect the amount of the policy was filed on September 4, 1930.

The defendant filed its answer to plaintiff's petition on October 4, 1930. In this answer it was admitted that the policy was issued in the names and for the amount set out in the petition, but it was alleged that the issuance of the policy was obtained through fraud practiced upon the defendant by the plaintiff and other persons. It was admitted that Jeff Nash, the person named as the insured in the policy issued, died as alleged in the petition, but that he (the said Jeff Nash) had never made application to the defendant for insurance and had no connection or business dealings of any kind with it. It is alleged that at the time it is claimed that Jeff Nash was well and in the home of the plaintiff making the application for the insurance, he was critically ill with cancer of the pancreas, and was a patient in the Charity Hospital in the city of Shreveport. It is further alleged that, at the time when the deceased was alleged to have been well and in the city of Shreveport taking a physical examination for the insurance, he was bedridden at his home near the village of Harmon, in the parish of Red River, and that he remained there until he died on April 9, 1930. It is specially alleged that with the connivance of the plaintiff, on February 18, 1930, a negro man of comparative youth and of sound health, whose name is unknown, but who falsely claimed that his name was Jeff Nash and that he was the father of Edna West, the plaintiff herein, made application to defendant for a twenty-payment life policy in the sum of $500. It is further alleged that subsequently, on March 24, 1930, a negro man of comparative youth and sound health, who was not Jeff Nash, took a medical examination required by the defendant at the hands of defendant's duly authorized examining physician and was duly passed and approved as a suitable risk for insurance, and that at the said examination the

said unknown person falsely represented himself as being Jeff Nash, that, because of the fraud practiced upon it in the substitution of a strange negro, or strange negroes, who made the application and took the medical examination in the name of the said Jeff Nash, it was induced to issue the policy of life insurance sued upon, and that, because it was thus fraudulently obtained by the said Edna West, who caused herself to be named beneficiary therein, the said policy is null, void, and of no effect.

A further defense is set up in the defendant's answer to the effect that, whenever and to whomever the policy was delivered, the real Jeff Nash was not in good health, but was suffering from a fatal disease; that in the application, which was made a part of the policy attached to plaintiff's petition, willful false statements were made as to the condition of Jeff Nash's health, the date of his last sickness, the existence of physical infirmities, hospital treatment received by him, and his age. It is alleged that during the entire period covering the making of the application, the taking of the medical examination and the issuance and delivery of the policy sued on, the said Jeff Nash was slowly dying with a malignant disease and was in such a condition that he would not and could not have been accepted as a risk by any insurance company.

It will be readily seen that the defense set up is three-fold: (1) That there was a substitution of parties for Jeff Nash in the application and in the medical examination. (2) That the real Jeff Nash was not in good health at the time the policy was delivered. (3) That there were fraudulent misrepresentations and false statements in the application with reference to the physical condition, age, and identity of Jeff Nash.

The plaintiff filed a motion to compel the defendant to elect which of these three defenses it would stand on at the trial of the case, and it answered the motion by electing to stand upon its defense that there was a substitution of parties for Jeff Nash in the application for the insurance and in the medical examination on which the policy was issued.

At the end of the first trial of the case judgment was rendered in favor of the plaintiff. However, the case was reopened and further testimony was introduced. At the conclusion of this second hearing, judgment was rendered in favor of the defendant and the demand of the plaintiff was rejected. From that judgment the plaintiff is prosecuting this appeal.

---

## OPINION

The only question at issue in this case is whether Jeff Nash, whose death is admitted and proved, was the person who made application for the policy sued on and who took the medical examination on the basis of which the policy is admitted to have been issued. The application on which the policy was issued was filed out on February 18, 1930, and according to it Jeff Nash was born April 15, 1880, which would make him 50 years old at the time. The agent who took the application stated that at the time it was written he remarked to the plaintiff that the applicant was "right young-looking" to be her father. In the body of the application it was stated that the applicant would take his medical examination two days later, on February

20. The defendant's examining physician was notified concerning the applicant and made several efforts to get him to his office, but did not succeed until over a month later, when the plaintiff's husband took a rather young-looking negro man to the doctor's office and had him examined as Jeff Nash. This man gave his name as Jeff Nash, and his age as 50 years. The physician who made the examination testified at the trial of the case and stated that the man he examined was in perfect health and appeared to him to be not over 45 years of age.

The Jeff Nash who died and whose identity has been established, was a patient in the Charity Hospital from February 12, 1930, until March 2, 1930, suffering from cancer of the pancreas. This fact is established by the records of the hospital, by his wife, Clara Nash, and by Arthur Wilson, one of his neighbors and church brothers. The home of the deceased was at Harmon in Red River parish, and there is not the slightest possibility that he could have been present in Shreveport at plaintiff's residence at a time anywhere near the date of the application. On February 18, 1930, the very day on which the application was written, Jeff Nash was in the Charity Hospital, and the nurse's record for that day, beginning at 1 o'clock a. m., and running through to 12 o'clock p. m., shows twenty-two separate and distinct entries relative to his condition and presence in the hospital. It would be the height of absurdity to presume that he could have been absent from the hospital on that day and in the plaintiff's home making this application. Furthermore, the man who was present there as the applicant appeared to be in good health and gave his age as 50 years but looked much younger. Jeff Nash was a sick man on that day, and could not have had the appearance of a healthy man. Also he was an old man, 70 years of age, the date of his birth, as shown by his family Bible, being September 20, 1861, instead of April 15, 1880, as stated in the application. Another important bit of evidence is the fact that plaintiff designated the real applicant as being her own father and gave the information that he was 50 years old. In her statement signed by her when she was making proof of the death of Jeff Nash, she stated that she herself was born May 16, 1892. That makes her purported father just 12 years, 1 month and 1 day older than she, which is a most preposterous statement and manifestly untrue.

It is a very significant fact that it was so difficult for the defendant's examining physician to contact the applicant in order to make the required medical examination. The excuse offered was that he was absent from the city in Dallas, Tex., on church duties and visiting a niece. As a matter of fact, the real Jeff Nash did not go to Dallas at any time. He left the Charity Hospital on March 2, 1930, in a hopeless condition and went to his home at Harmon and remained there until April 9, 1930, the date of his death. On March 24, 1930, the date of the medical examination, when a well man who looked to be not over 45 years old was examined by the defendant's physician, Jeff Nash was at his home, one hundred miles away from Shreveport, at the point of death. It is certain that the man who was examined was a comparatively young man in good health and was not Jeff Nash. Under the evidence it is perfectly patent that the plaintiff knew from the beginning that the man who made application and who was examined by the defendant's physician was not the Jeff Nash whose death and iden-

tity were established at the trial. Her actions throughout the entire transaction, from beginning to end, were fraudulent and constitute an attempt to collect money on account of the death of a man 70 years of age, who was known to be hopelessly stricken with disease, by having a much younger and healthy man secure a life insurance policy in his name, knowing full well that the real Jeff Nash would soon be a dead man.

When Dr. Leroy Scott, the defendant's examining physician, was offered as a witness for the purpose of testifying as to what man he examined, and when the examination took place, counsel for plaintiff made the following objection which was overruled by the trial judge:

"By Mr. Bush: I object to that for the reason that under the law,—under Act 227 of 1916, that the application and medical examination is not attached to the policy and we object to testimony from this witness with reference to the examination of Jeff Nash—

"By the Court: The objection is overruled and the court will hear the testimony of the witness for the purpose of ascertaining the identity of the person who was examined as Jeff Nash with reference to this policy—the testimony will be admitted to shed whatever light it may on the question of the identity of the person who was examined for insurance in this case.

"By Mr. Bush: I will note my objection—this evidence is objected to as it is immaterial, irrelevant and inadmissible under Act 227 of 1916, for the reason that there is no application and no medical examination or certified copy thereof attached to the policy—

"By the Court: Let the objection be overruled."

In his brief counsel for plaintiff urges this objection very strenuously. A careful reading of Act No. 227 of 1916, relied upon, shows that it has no reference whatever to medical examinations, and does not require that they should be indorsed upon or attached to the policy. The act requires that life insurance policies shall contain the entire contract between the company and the assured, and provides:

"* * * And all statements purporting to be *made by the insured* shall in the absence of fraud be deemed representations and not warranties, and no statement or statements [purporting to be *made by the insured*] not endorsed upon or attached to the policy when issued shall be used in defense of a claim under the policy unless contained in a written application and unless a copy of such statement or statements be endorsed upon or attached to the policy when issued. Any waiver of the provisions of this section shall be void." (Italics ours.)

Medical examinations do not constitute any part of the contract between the life insurance company and the insured, nor do they contain any statements made by the insured. In support of his contention that no testimony bearing on the medical examination can be introduced by the defendant in its effort to resist the payment of a life insurance policy, counsel cites three cases. Eddins v. National Life & Accident Insurance Co., 19 La. App. 472, 133 So. 816, 818. In that case the statement was made that "* * * the defendant can take no steps to void the policy ab initio on account of any false representations contained in it because of the fact that the application and *examination* do not appear to have been attached to the policy at the time it was issued. See Act No. 227 of 1916." The use of the word *"examination"* in that statement was superfluous and inadvertent, as the act clearly is confined to the application which contains answers and statements made by the insured. Brown v. Continental Casual-

ty Co., 161 La. 229, 108 So. 464, 45 A. L. R. 1521. This case can have no application to the case at bar, for the reason that in that case there was no omission to make the entire application a part of the policy, while, on the other hand, no medical examination was required at all. Silver v. National Life Ins. Co., 6 La. App. 95. This case turned upon the fact that there was no medical examination at all. Under Act No. 97 of 1908, where the insurance company does not require a medical examination, it waives its right to attack the correctness of the applicant's statements made in the application. No such condition exists in the case at bar.

But all discussion of Act No. 97 of 1908, or of Act No. 227 of 1916 is out of place in the discussion of this case. No effort is being made here by the defendant to show that the person whose application was taken made any false statements with reference to his age or his physical condition. It is admitted that he was of the age stated and that he was in perfect health. No attack is made upon the truthfulness of the medical examination or of the application. The only object sought by the defendant in putting its examining physician on the stand is to show that the man he examined was a comparatively young man in good health, a fact which is admitted by the plaintiff herself. Regardless of any possible application of the two acts referred to, and regardless of whether either or both of them were recorded or not, the defendant would have a right, upon alleging fraud, to show that the man whose death has been proved and admitted was not the man that made the application or who was examined.

For the reasons assigned, the judgment appealed from is affirmed; the plaintiff to pay all costs of both courts.