## HARDING v. METROPOLITAN LIFE INS. CO.

### No. 17089.

Court of Appeal of Louisiana. Orleans.

April 24, 1939.

Rehearing Denied May 22, 1939.

Writ of Certiorari Denied June 26, 1939.

178

Spencer, Phelps, Dunbar & Marks, of New Orleans (Wood Brown, of New Orleans, of counsel), for appellant.

Cabral & Graham, of New Orleans (Harry Cabral, of New Orleans, of counsel), for appellee.

JANVIER, Judge.

Ellen Harding sues as beneficiary on a life insurance policy in the sum of $1,000, which she alleges was issued by defendant, Metropolitan Life Insurance Company, on the life of Wesley Johnson, but which policy, she avers, remained in the possession of the said company and was never delivered. Johnson died on May 18, 1929, and plaintiff alleges that, for no valid reason, payment under the policy has been refused.

Defendant company denies that any such insurance contract came into existence, though it admits that application for a policy in the sum of $1,000 was made and that payments totaling $14.11 on account of the first premium were collected and retained by its soliciting agent, Weston, who secured the application for the policy. Defendant contends that no contract came into existence for the reason that it was unwilling to issue the policy in the "intermediate" form applied for because of the occupation of the applicant and that it therefore rejected the said application. It admits that it prepared another policy, known as a "special class" policy, in the same amount, but requiring a slightly higher premium, and it admits that it sent this policy to its agent, Weston, with instructions to him to prevail upon the applicant to execute an amended application requesting a "special class" policy and to secure from the said applicant the amount due as the first premium on the policy tendered and to then deliver to the applicant the said "special class" policy. But it avers that the said policy was never accepted by the said applicant and that he did not make application for a policy in that form.

Plaintiff maintains that Johnson was never notified of the company's rejection of his application for an "intermediate" policy and was never tendered the "special class" policy which the company was willing to issue and she contends that, in the absence of such notification, Johnson was under the impression that his application had been approved and that a policy in accordance with his application would be forthcoming. Plaintiff also contends that the policy which the company was willing to issue and which it called a "special class" policy complied substantially with the application, and that it was so similar to what would have been issued had the application been granted that it is, in effect, the policy which was requested.

Defendant denies this and maintains further that, even if the policy prepared could be considered as the policy applied for, still no contract came into existence because the first premium has never been paid, and it points to a stipulation in the application and to another in the policy, which provide that in no event shall the policy become effective until the first premium has been paid. This stipulation in the application reads as follows:

"It is understood and agreed * * *.

"4. That the Company shall incur no liability under this application until * * * the full first premium stipulated in the policy has actually been paid to and accepted by the company during the lifetime of the Applicant * * *."

A similar stipulation, as it appears in the policy, reads as follows:

"This policy shall not take effect unless or until the first premium therefor, as entered on the foregoing receipt, has actually been paid in cash."

But plaintiff counters with the argument that the full first premium has been paid and calls to attention receipts showing payment of $15.61, admittedly more than sufficient to cover the first premium, whether on the policy applied for and rejected, or on the policy which the company was willing to issue.

The insurer admits that its agent received, in connection with the application, total payments of $14.11, but it denies that an additional amount of $1.50 was received, and brands as a forgery the signature on the receipt purporting to evidence that

180

payment, and it takes the position that if that sum, $1.50, be deducted from the amount claimed to have been paid, there will remain only $14.11 as the amount paid on account of the first premium, whereas $15.26 is shown to be the amount required as first premium on the "special class" policy which defendant was willing to issue, and it contends, therefore, that it cannot be said that the first premium has been paid, as is required by the application and by the policy, and that, therefore, since payment of the first premium was made a condition prerequisite to the attaching of the coverage of the policy, the said coverage has never been affected.

Finally, the company contends that in any event it is not liable, for the reason that the Wesley Johnson who died and on whose death the claim is based is not the person who presented himself for medical examination in connection with the application; in other words that, when the medical examination was made, there was substituted for the elderly Wesley Johnson, who was in ill health, a younger and a healthier person, and that the said Johnson would have been rejected had he been presented to the medical examiner.

In the court below there was judgment for plaintiff as prayed for. Defendant has appealed.

■ We shall first approach the disputed questions of fact.

Was there a fraudulent substitution at the medical examination? Of course, if there was such substitution, the matter must end there, for there can be no recovery where the issuance of a policy of life insurance is induced by such fraud. Hill v. Southern Life & Health Insurance Co., La.App. 147 So. 121; West v. Life & Casualty Insurance Co. of Tenn., 19 La. App. 249, 140 So. 104. The applicant, on February 12, 1929, declared himself to be 48 years of age and the person examined, as stated in defendant's brief, was "in good health, with a sound heart". Yet it appears that the person who died on May 18, 1929, just about three months later, was a rather elderly man, with heart trouble of a very severe character.

■ The evidence produced by defendant shows that in 1929 Wesley Johnson was a rather aged man and was in failing health and that at no time had he ever worked as a stevedore. The children of the said Johnson placed his age at 78 and one of these children testified, at the time of the trial, that he himself was 49 or 50 years of age. This, of course, would have made it impossible that his father was only 48 years of age at the time he made application for the policy.

The defendant also produced the testimony of a Mr. G. S. Davidson, of St. Francisville, who stated that he had known Wesley Johnson when he lived in St. Francisville in 1924 and that the person he knew could not have been younger than 86 or 90 years old at the time of his death. In contradiction of this testimony, however, plaintiff shows that, not only was Wesley Johnson examined when this application was made, but that he had been examined by the company's physician in connection with the issuance of a previous policy, over which no question had been made, and, in addition to this, several witnesses testified that they were present when the medical examiner presented himself to examine Johnson and that the man examined was the same Johnson who later died.

The evidence produced by defendant tends to cast suspicion on the question of whether or not the Johnson who died is the same person who presented himself for medical examination, but, in view of the finding of our brother below, we are unable to state that there was a substitution. Only a question of fact is involved here and the finding of the district court is not manifestly erroneous.

■ We next consider the disputed receipt for $1.50. If the signature on this receipt is a forgery, then the amount actually paid was $14.11, whereas, if this receipt is genuine, then the amount was $15.61—admittedly sufficient to cover the cost of the premium on either policy.

We find in the record the testimony of two handwriting experts—one produced by plaintiff, the other by defendant. There is one rather suspicious circumstance in connection with the production of this receipt and that is that, when plaintiff, in an effort to show that the first premium had been paid, presented the receipts at the office of the defendant company, she did not present this particular receipt for $1.50. She was told that the other receipts totaled only $14.11 and that the first premium amounted to $15.26. Obviously there was, according to these figures, a deficiency of $1.15. Quite a long time later she again appeared at the

office with the additional receipt for $1.50. This additional receipt shows an overpayment of 35 cents and we cannot understand why, under any set of circumstances, such an amount would have been paid. It is possible that the plaintiff may have misunderstood the statement that an additional $1.15 would be necessary and understood that $1.50 would be required and that she thereupon fraudulently prepared the receipt for $1.50. But this is only a suspicious circumstance and is not sufficient, we think, to overcome the testimony that the amount was actually paid to the agent and that the receipt was executed by him. Had our brother of the district court reached a different conclusion on this disputed question, we would have found it impossible to find fault with his conclusion. But, since he seems to have been of the opinion that the receipt was genuine, we cannot say that he was wrong.

Except, however, insofar as these facts may tend to cast suspicion on the good faith of plaintiff, whether the total amount paid was $15.61, or was only $14.11, is of no great importance because of the view which we take of the entire matter, as will be later explained.

■ We are unable to agree with plaintiff that the policy which was prepared by defendant and sent to the agent, Weston, to be tendered by him to Johnson, was so similar to the policy requested in the application that the company should not be heard to contend that it did not actually approve the application as made. The application shows that the policy applied for was what the company classified as an "intermediate" policy, whereas the policy which was prepared for submission to Johnson shows on its face that it is a "special class" policy. It is probably true that, without the explanation offered by the company's actuary, it might be difficult to ascertain the difference between the two, but, with that explanation, we have no difficulty in understanding that the "intermediate" policy is issued where there is nothing unusually unattractive about the risk, whereas the "special class" policy is issued wherever, because of the occupation of the applicant, or for some other reason, the hazard is greater than the company cares to accept under its "intermediate" form of policy. The evidence shows that when the "special class" policy is issued a higher premium rate is made. This is plainly shown in the record, from which

we have no difficulty in concluding that the company definitely rejected the application submitted by Johnson and prepared for him a different policy bearing a higher rate. It thus appears that the company did not accept the offer of Johnson and that no contract based on actual acceptance of that offer came into existence.

■ But plaintiff maintains that the rejection of the application was never communicated to Johnson and we have no doubt, from the record, that this is true. In fact, Weston, the agent, shows plainly that he did not tell Johnson that his application had been rejected.

We think it very evident that the true reason which prevented Weston from communicating these facts to Johnson was his fear that Johnson might agree to the substituted policy and sign the new application. Had he done so, Weston would have found himself under the necessity of remitting with the application the $14.11 which he had already received, but none of which he had sent in. The company itself shows that Weston embezzled the $14.11, and, therefore, had the new application gone in, Weston would have been bound to produce this amount, which he did not have. The company seeks to overcome the persuasive force of this fact by showing that an agent who sells a policy is entitled, as his commission, to a substantial part of the first premium. But, even if Weston would have been within his rights in actually retaining that part of the first premium which he claims was his commission (he says "we get from 35 to 60 per cent. of the first premium"), still he must at once have found the balance to be remitted to the company. Furthermore, the record makes it plain that an agent is not permitted to deduct his commission from the amount collected, but must remit the whole amount and then subsequently obtain his commission from the company itself.

We conclude that for this, or for some other reason, Weston did not communicate to Johnson the information that his application had been rejected.

■ But defendant argues that, as a matter of law, mere delay in rejecting an application for insurance cannot be construed as an acceptance of the application, and a review of the many authorities cited convinces us that, strictly speaking, no contract of insurance should be held to result from such delay, though there is

some authority for the view that, in some situations, "retention of the premium and failure to reject within a reasonable time may imply an acceptance". Couch, Cyclopedia of Insurance Law, Vol. I, page 154, sec. 86. This question is discussed at length in Bradley v. Federal Life Ins. Co., 295 Ill. 381, 129 N.E. 171, 15 A.L.R. 1021, 1026, Security Ins. Co. v. Cameron, 85 Okl. 171, 205 P. 151, 27 A.L.R. 444, 463, and, finally, in Stray v. Western States Life Ins. Co., 163 Wash. 329, 300 P. 1046, 75 A.L.R. 950, at page 952. Even though it be true that technically no contract has been made because the offer tendered has never been accepted, it is evident that there may be situations in which substantial harm may come to the applicant by reason of the failure of the insurer to act with reasonable promptness upon the tendered application. Here, for instance, the application was made on February 12, 1929; the physical examination was made on February 24, 1929; the sum of $14.11, which, so far as we can ascertain from the record, would have supported the "intermediate" policy which was applied for, was paid in full. And yet no rejection was communicated to the applicant up to the day of his death on May 18, 1929.

It is quite true that an insurance company is entitled to a reasonable time within which to investigate and to act upon an application and that, if death occurs before it has acted and before the expiration of that reasonable period, no liability results. But when that reasonable period expires—and what is a reasonable period must depend upon the facts in each case—and it fails to communicate its rejection to the applicant and also fails to return the amount conditionally paid with the application, surely the applicant, for a time at least, may assume that his application has been accepted and that shortly his policy will make its appearance. Just how long he may rely upon this assumption is a matter which also must be determined by the facts of each case. An ignorant laborer, having no knowledge of the insurance business, may, for a considerable time, assume, from the retention of his premium and the failure to communicate rejection of his application, that the application has been approved and that the policy will be forthcoming. We recognize, of course, that sooner or later, if no policy is received, the applicant may be under the duty to inquire and to investigate to ascertain why he has not received it, and, after the lapse of too

long a time, it may be that it would be proper to say that his own failure to investigate should be held to be negligence on his part. But, as we have said, if the company retains his money and fails to advise him that it has rejected the application, he may, for a reasonable period, rely upon those facts, and, acting upon that reliance, fail to attempt to place his insurance elsewhere. If he does so rely and a loss occurs, it may properly be said that the fact that he has made no other attempt to secure insurance is properly chargeable to the negligence of the company in failing to communicate to him the facts which—had he known them—would have prompted him to secure insurance elsewhere.

In comparatively recent years there have been decided several cases based on this theory: That, though 'the delay cannot be construed as an acceptance, it may be looked upon as negligence and as being the proximate cause of the loss which would not have been sustained except for the negligence. We are impressed with the sound application of this principle as it is set forth in Strand v. Bankers' Life Insurance Company, 115 Neb. 357, 213 N.W. 349, 350:

"The view that there is a remedy based on negligence seems to be founded on reason and justice. The receipt in the present case shows on its face that the insurance company, without asssuming any insurance risk, accepted conditionally the first annual premium. The transaction makes the insurance company applicant's trustee for the return of the premium if the application is rejected and for the unconditional acceptance of the premium if the application is approved and the policy delivered. In connection with the application the receipt implies time for a proper investigation of the risk under consideration. Good faith and fairness of both parties are required in negotiations for insurance. The retaining of the money of the applicant beyond a reasonable time would deprive him of its possession and use during the delay. The use of money or interest thereon is a valuable right. Negligent or inexcusable delay on the part of a trustee is a wrong, if it deprives the beneficiary of the use of a trust fund which has served its purpose as such. The receipt, the application and the report of the examining physician imply a duty on the part of the insurance company to act on the proposed risk within a reasonable time

under the circumstances surrounding the negotiations. In addition, an unreasonable delay and the retention of an unearned premium might deprive an insurable applicant of an opportunity to apply elsewhere for and to procure life insurance. Furthermore, an insurance company transacts business under a charter from the state. It is now recognized that insurance is affected with a public interest. It is regulated by the government for the protection of the insuring public. The privilege of an insurable person to apply to a licensed insurer for insurance is a vital feature of domestic life as well as of the industrial world. The possession of a premium held by an insurance company as a trust fund, without any obligation for insurance prior to the issuance and delivery of a policy, imposes a duty of acting on the application within a reasonable time. The conclusion therefore is that there is a remedy in the form of an action in tort for an unnecessary and negligent delay in performing such a duty, if it prevents an insurable applicant from procuring a policy which he would otherwise have received, thus causing a loss."

The same view is well expressed in Kukuska v. Home Mutual Hail-Tornado Insurance Company, 204 Wis. 166, 235 N.W. 403, 404:

"It is a well-established principle of the law of contracts that an offer does not ripen into a contract unless accepted; that, if the offeree within a reasonable time does not accept the offer, it may be treated as if rejected. In accordance with these established principles, the conclusion is reached in a number of cases that failure to act upon an application results in no liability because there is no contract of insurance. A consideration of the cases in which questions of this character have arisen discloses the fact that courts have had more difficulty in ascertaining the correct basis of liability that in holding an insurer liable under such circumstances. * * * Under such circumstances, having in view the nature of the risk against which the insurer seeks protection, is there not a duty upon the insurer to act upon the application within a reasonable time? Can the insurer, having pre-empted the field, retain control of the situation and the applicant's funds indefinitely? Does not the very nature of the transaction impose upon the insurer a duty to act? It is considered that there is a duty. If the insurer is

under such a duty and fails to perform the duty within a reasonable time and, as a consequence, the applicant sustains damage, it is not vastly important that the legal relationship be placed in a particular category. If we say it is contractual, that is, there is an implied agreement under the circumstances on the part of the insurer to act within a reasonable time, or, having a duty to act, the insurer negligently fails in the performance of that duty, or that the duty springs out of a consensual relationship, and is therefore in the nature of a quasi contractual liability, is not vitally important. Each view finds some support in the cases. It seems to be more in accord with ordinary legal concepts to say that it is a quasi contractual duty. The legal consequences may be somewhat different in each case; no doubt they would be widely variant under a system of pleading different than that which prevails here. The consequent liability to respond in damages is the same in each case."

See, also, Columbian National Life Insurance Company v. Lemmons, 96 Okl. 228, 222 P. 255; Duffie v. Bankers' Life Association, 160 Iowa, 19, 139 N.W. 1087, 46 L.R.A.,N.S., 25; Wilken v. Capital Fire Insurance Company, 99 Neb. 828, 157 N.W. 1021.

Nor is this view in any way antagonistic to the principle on which was decided Gonsoulin v. Equitable Life Assurance Society of U. S., 152 La. 865, 94 So. 424, for there, though most of the facts bear similarity to those before us, the death occurred before the expiration of a reasonable period within which the company should have determined whether to accept or to reject the risk. There the report of the final medical examination was received by the insurer about fourteen days prior to the death, and even then the applicant knew that there was some question about the condition of his health. There intervened, then, only a short period, which was not sufficient to permit it to be said that the company had, for an unreasonable time, failed to make known its decision concerning the application. There were other grounds on which that case may be distinguished, but, since we are concerned here principally with the interesting question of what is an unreasonable delay, we prefer to base the distinction solely on that ground since that distinction plainly appears.

In Foster v. Morrison, La.App., 145 So. 13, cited by defendant, an entirely different situation was presented. There, before the company issued the policy applied for, the applicant attempted to cancel his application and sued for the return of the premium paid. The court held that no contract had been entered into since the offer had been withdrawn prior to its acceptance.

Nor is Blackwell v. Roseberry, La.App., .154 So. 641, also cited by defendant, applicable here. There the plaintiff had applied for a policy of life insurance. The insurer was unwilling to issue a policy in the form applied for, but tendered another, which the applicant did not accept. He thereupon sued for the return of the premium paid and the court held that there was no contract since he "did not consent to a change in the contract and never accepted the amended or substituted second policy".

█ In considering what is an unreasonable delay, we are interested here in the terms of the conditional receipt which was given when the agent, Weston, accepted a payment on account of the first premium. The blank form of this receipt is printed and is attached to the blank application, so that an agent, when the application is filled out and a payment is made on account of the premium, may detach the receipt, fill it in, and give it to the applicant. This receipt reads as follows:

"Date 1/29 1929. Received from Ellen Harding 26½/₁₀₀ Dollars, being a deposit of ——— weekly premiums or one monthly premiums on account of Application for Insurance in the Metropolitan Life Insurance Co. made this date. If the application is accepted and a Policy issued, this sum will be applied toward payment of the premiums thereon. If application is rejected, the amount will be returned to the applicant. No obligation is incurred by said company by reason of this deposit, unless and until a Policy is issued upon said application and unless at the date and delivery of such Policy the Life proposed is alive and in sound health, except that if the Life proposed is now in sound health and the amount paid by applicant at the time the application is written is not less than four weekly premiums (or one monthly premium if a monthly premium policy) and this receipt, detached from the original application, covering such payment, is surrendered to the Company, the Company agrees, if the Application is approved at the Home Office in New York, that, should death occur prior to the delivery of the Policy and within eight weeks from the date of the original application, it will, nevertheless, pay such amount as would have been due under the Policy, if issued. No obligation is assumed by the Company unless the application is so approved and the Life proposed is now in sound health.

"District ——— Debit No. ———.

"A. Weston, Agent."

We note, in the first place,· an agreement—though the obligation would, of course, have existed regardless of the written agreement—that "if application is rejected, the amount will be returned to the applicant". We note, also, that it is stated that, even if the policy should not make its appearance within eight weeks, the company undertook under certain conditions to "pay such amount as would have been due under the policy if issued". Surely the holder of this receipt would have been within his rights in assuming that, should his policy be rejected, he would be advised and the amount of his premium would be returned to him, and surely, also, this receipt fixed eight weeks as the time which it might be expected that the company might require to pass upon the application and execute and deliver the policy. Even in the contemplation of the company itself, that much time might be required. If longer than that was required, it is obvious that there was negligence on the part of the company. It is true that it did not take so long as that in this case and that it communicated its decision to its agent well within that limit, but, for the purpose of transmitting this information, it chose its agent, Weston, and thus made itself liable for Weston's neglect.

If it was contemplated that the company might require as much as eight weeks, surely it cannot be said that Johnson himself, before the expiration of that time, was negligent in not investigating to determine why his policy had not been sent. In other words, he was told that it might not be delivered to him for that period. He was, therefore, justified in waiting until the expiration of that period and for a reasonable time beyond it to commence his investigations, and during that reasonable time he was justified in assuming that he was protected by the con-·

tract which he had applied for and which, so far as he knew, had never been rejected.

Even if the contest concerning the disputed receipt for $1.50 had been decided favorably to defendant, a different result on the question of liability would not have resulted because, to reach the conclusion to which we have come, it is not necessary that we find that the premium on the policy which the company was willing to issue should have been paid.

Our conclusion results not from the fact that the company was willing to issue the second policy, but from the fact that it failed to advise of its refusal to issue the first. Thus, since even without the payment of the additional $1.50, Johnson's payments were sufficient to cover the first premium on the policy applied for, and, since it was that policy which he was justified in assuming would be issued, his failure to pay all the premium required by the second, even had he failed to do so, would be of no moment.

We are unable to hold that any fraud has been committed and are of the opinion that the true reason for the situation in which the defendant finds itself is the defalcation of its own agent, first, in embezzling the payments, and, second in failing to give notice of the rejection. As a matter of fact, there can be little, if any doubt, that, if Johnson had been advised of the fact that he might obtain the protection only upon paying the small additional amount, he would have done so since he had paid practically all that would have been required even for the higher rated policy.

██ The judgment as rendered below runs in favor of plaintiff for the sum of $1,000, with 5 per cent. interest from April 18, 1929, until paid, "together with attorney's fees and penalties provided by law in such cases for failure to pay plaintiff the amount of the said policy sued on herein * * *".

In the first place, the date from which interest should commence to run is obviously incorrectly fixed in the judgment since Johnson did not die until May 18, 1929.

██ Furthermore, the only statute under which penalties may be awarded to the claimant in a suit on a policy of life insurance is Act No. 17 of 1920, under which, life insurance companies are re-

quired to pay all death claims within sixty days from date of receipt of due proof of death and under which, also, it is provided that, where payment is withheld "without just cause", judgment "will bear interest at the rate of 6 per cent. per annum from date of receipt of due proof of death until paid".

Act No. 310 of 1910 has no application to a case of this character, for it is well settled that that statute, which, in certain cases, does provide for the imposition of attorney's fees and a penalty, is applicable only in cases of illness and accident and not where suit is for the death of the person insured. See Michel v. London & Lancashire Indemnity Company of America, 162 La. 160, 110 So. 186; Brown v. Continental Casualty Company, 161 La. 229, 108 So. 464, 45 A.L.R. 1521; Canal-Commercial Trust & S. Bank v. Employers' Liability Assurance Corp., 155 La. 720, 99 So. 542; Braxton v. Unity Industrial Life Insurance Company, 14 La.App. 435, 131 So. 629. Even if Act No. 310 of 1910 were applicable to a suit in which claim is made under a life insurance policy for the death of the insured, the penalties provided by that statute are not mandatory and will be imposed only if, in the judgment of the court, the denial of liability was not based on sufficient reasons and was not made in good faith. The same may be said of the provisions of Act No. 17 of 1920, because that statute provides that the penalty, 6 per cent. interest, shall be imposed only if the claim is rejected "without just cause". We think that here there was just cause and that it cannot be said that this claim was rejected arbitrarily.

██ Since neither the penalty of the Act of 1910, nor that of the Act of 1920, is applicable to this situation, plaintiff is entitled merely to legal interest from the day on which the claim should have been paid.

██ We are unable to determine from the record just when the proof of loss was submitted. We find from the record, however, that Mr. Dupuis, an employe in the local office of defendant company, states that on June 26, 1929, he was aware of the death of Johnson. In the absence of any other proof we will assume that June 26, 1929, is the date on which proof of loss was filed with the company.

It is therefore ordered, adjudged and decreed that the judgment appealed from

be and it is amended so as to read as follows:

"It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Ellen Harding, and against the defendant, Metropolitan Life Insurance Company, Inc. of the State of New York, in the full sum of One Thousand Dollars ($1,000.00), with legal interest thereon from June 26, 1929, until paid, and for all costs."

It is further ordered, adjudged and decreed that the judgment appealed from, as thus amended, be and it is affirmed.

Amended and affirmed.