502 So.2d 214 (1987)
Mrs. Claude CREDEUR, Plaintiff and Appellant-Appellee,
v.
CONTINENTAL ASSURANCE COMPANY, Lafayette Parish School Board, Pan American Life Insurance Company & the State of Louisiana, Through the Board of Trustees of the State Employees Group Benefits Program, Defendant and Appellees-Appellant (Laf. School Bd.).
No. 86-200.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
Writs Denied March 26, 1987.
*215 Roy and Hattan, L. Lane Roy, Lafayette, for defendant-appellant-appellee.
*216 Privat and Regan, Kenneth O. Privat, Crowley, for plaintiff-appellee-appellant.
Kantrow, Spaht, Weaver & Blitzer, Paul H. Spaht and Lois E. Hawkins, Richard N. Burtt, General Counsel, Baton Rouge, for defendants-appellees.
Before DOUCET, LABORDE and KING, JJ.
DOUCET, Judge.
Following the death of her husband, Claude Credeur, plaintiff instituted this suit claiming benefits under a group life insurance policy issued by defendant, Continental Assurance Company. Also named defendants were the Board of Trustees of the State Employees Group Benefits Program (the State Program), administrator of the policy, the Lafayette Parish School Board (the School Board), Mr. Credeur's employer, and Pan American Life Insurance Company, former insurer of Mr. Credeur under a group life policy. The trial court sustained an exception of improper venue filed by the State Program and rendered a summary judgment in favor of defendant, Pan American. After trial on the merits, judgment was rendered in favor of plaintiff and against the School Board, but against plaintiff dismissing her suit against Continental. Both the School Board and plaintiff have appealed.
Mr. Credeur was employed as a janitor with the School Board since October 1967. He began using sick leave the last couple of days in May 1983, and thereafter never returned to work. In early June 1983, he contacted John Guilbeaux, assistant personnel director of the School Board, and indicated a desire to retire because he had not been feeling well and felt that he could no longer perform his job as he would have liked to. Mr. Credeur felt however, that he could not afford to retire because of the accompanying reduction in salary so it was agreed that he could use his accumulated sick and annual leave and retire at a later date. At this time, Mr. Credeur expressed his concern regarding continued life insurance coverage upon his retirement. Mr. Guilbeaux testified that he assured Mr. Credeur that he would continue to be covered. Arrangements were made accordingly and Mr. Credeur ceased working but remained on the payroll, receiving his full salary. Mr. Guilbeaux testified that this procedure was proper as long as Mr. Credeur periodically presented doctor's certificates, which he did, indicating that he was unable to return to active work. Mr. Credeur subsequently retired on February 29, 1984 and died as a result of cancer on April 1, 1984.
When he began using sick leave in May 1983, Mr. Credeur was insured, as an employee of the School Board, under a group life policy issued by Pan American. He maintained coverage in the amount of $2,000. At some point in time, the record does not indicate precisely when, the School Board inquired into the possibility of joining the State Employees Group Benefits Program (State Program). It was agreed that coverage of School Board employees would become effective November 1, 1983. Continental Assurance Company underwrote the life insurance portion of the group coverage provided by the State Program.
Prior to enrollment, on June 22, 1983, Hubert Linscomb, a field service manager for the State Program, met with the Insurance Committee of the School Board. At the meeting, Mr. Linscomb distributed copies of the State Program booklet containing the rules and benefits pertaining to both health and life insurance. Mr. Linscomb testified that he explained "every aspect of eligibility for entrance into the program and every aspect of every rule concerning the program." This included an explanation of the deferral rule contained in the section of the booklet concerning the effective date of individual life insurance coverage. The pertinent portion of the booklet read:
"EFFECTIVE DATE OF INDIVIDUAL INSURANCE
On May 1,1976, Employees and Retirees, and their eligible Dependents, enrolled on April 30, 1976, under the predecessor *217 contracts and agreements became immediately eligible for the benefits described herein on May 1, 1976, provided, such Employee was actively at work on that date and such Retiree or Dependent was not hospital-confined or disabled on that date.
Subsequent to May 1, 1976, all new and other full-time Employees and Retirees, other than temporary Employees, and their eligible Dependents will become eligible for coverage on the first day of the month coinciding with, or next following the completion of one month service, provided, however that no employee coverage shall in any event become effective unless the employee makes such request within thirty (30) days after the date of employment.
The effective date of coverage will be defined under the following circumstances; and the section entitled "Dependents" will not apply.
1. If an Employee is absent from active full-time work on account of accidental bodily injury or sickness when his insurance would otherwise take effect, it shall take effect on the date he returns to active full-time work; and

2. If a Retiree or Dependent is hospital confined on account of accidental bodily injury or sickness on the date his insurance would otherwise take effect, the insurance shall take effect on the date the hospital confinement terminates, (or disability ends), whichever is later."
(emphasis added)
A similar provision is found in the master insurance policy held by the State Program. Mr. Linscomb also attended open meetings of the School Board for the purpose of answering questions concerning coverage under the State Program.
In response to a request from the State Program, the School Board compiled separate lists of active and retired employees. These were the only two categories of employees of which lists were requested. Mr. Credeur was included in the list of active employees as of August 22, 1983, the date the list was compiled. Mr. Guilbeaux testified that since there were apparently only the two categories of employees, and Mr. Credeur was not retired but on the active employee payroll receiving his full salary, he was included in a list of active employees. Other than the deferral provision in the booklet, no definition of an active employee was provided to the School Board.
On September 26, 1983 the active employees of the School Board were enrolled in the State Program. Dr. James McElveen, executive director of the State Program, testified that he sent representatives to assist the School Board in enrolling its employees. However, he stated that it was the responsibility of the School Board to enroll its own employees but that because of the large number of employees, he felt the School Board required assistance.
Ralph Carpenter, a supervisor of field services for the State Program, actually enrolled Mr. Credeur. The enrollment form was a one-page document listing personal data of the employee and dependent such as dates of birth, social security numbers, etc., and benefit-beneficiary data. Mr. Carpenter stated that no questions were asked concerning the active status of the employee because he relied on the list of active employees provided by the School Board. This was the normal procedure. Mr. Credeur enrolled for $28,000 in life insurance coverage. There was no allegation of any fraud or misrepresentation concerning Mr. Credeur's action in obtaining the increased coverage. Dr. McElveen testified that upon enrollment, all employees were given a copy of the State Program booklet containing benefits and rules pertaining to the coverage provided.
Mr. Credeur's share of the premiums were subsequently deducted from his check by the School Board and forwarded to the State Program which would then remit the premium payment on the policy to Continental. Mr. Guilbeaux testified that although he had not discussed Mr. Credeur's life insurance coverage with him, he assumed that as an active employee, Mr. *218 Credeur was covered. Upon Mr. Credeur's retirement in February 1984, the School Board sent a change form to the State Program notifying it that Mr. Credeur was changing to retired status. As far as the State Program was concerned, Mr. Credeur had been an active full-time employee actually working and was now changing to retired status. During this period, Mr. Credeur received health benefits from the State Program relating to the treatment of his cancer. However, the health and life portions of the State Program were handled separately at the State level and apparently the payment of such health benefits was never brought to the attention of the person(s) handling the life insurance coverage. Mr. Guilbeaux testified that although he and the School Board knew at some point before his retirement that Mr. Credeur was suffering from cancer, this fact was not communicated to the State Program or Continental.
Upon Mr. Credeur's death in April 1984, the School Board submitted a proof of death form, death certificate, and change of status form to the State Program. The State Program apparently did not discover the discrepancy regarding Mr. Credeur's eligibility and forwarded the information to Continental. Continental determined that since Mr. Credeur had not been actively working on November 1, 1983 when coverage generally became effective for employees of the School Board, and had not thereafter returned to active full time work before his death, his insurance coverage had never become effective. Accordingly, benefits were denied to plaintiff. This suit followed.
The trial court found that Mr. Credeur was not eligible for insurance coverage under the State Program. The court found that the contract and definitions were sufficient to inform the School Board that Mr. Credeur was not an active full-time employee. Further, it was held that the School Board had a high degree of duty towards the employee to make clear everything that was required of him to be covered, and it failed in performing that duty. The court also found that the State Program properly relied on the list of active employees submitted by the School Board when Mr. Credeur was enrolled. No negligence was found on the part of the State Program and therefore, no negligence could be imputed to Continental as principal. Although the State Program was not a party at trial, it was necessary to examine the issue of its negligence to address the issue of vicarious liability on the part of Continental.
Defendant-Appellant, the School Board, contends that the trial court erred in holding it liable. It, as well as plaintiff-appellant, Mrs. Credeur, argues that the provisions regarding the definition of active fulltime employee and language in the adoption agreement between the School Board and the State Program were ambiguous and should be construed against Continental.
The adoption agreement provided that the State Program would provide "immediate coverage" for a participant of the prior insurance program underwritten by Pan American. The same agreement however, also provided that "the participation of Applicant in the State Program is subject to the plan of benefits and rules as outlined in the Group Benefits Booklet...." Although "applicant" may be distinguishable from "employees of applicant," the evidence shows that the School Board was fully informed that the rules in the booklet covered the rights of anyone seeking insurance coverage under the State Program. The master insurance policy held by the State Program contained a similar deferral provision.
Neither Mr. Credeur nor any of the other School Board employees were required to undergo the medical examinations which are usually a prerequisite to obtaining ordinary life insurance coverage. The deferral provision is a standard requirement for eligibility under group insurance plans as insurance companies rely heavily upon the presumption that one who can work actively is an insurable risk. See Neilson v. Home Life Insurance Company, 235 So.2d 151 (La.App. 4th Cir.1970); 1 Appleman, *219 Insurance Law and Practice § 44 at 131. In cases involving similar provisions limiting coverage under group life policies, other courts have denied benefits under facts and circumstances such as those present in the instant case. Those courts found that because the insured had not been actively working at the time the coverage would have become effective and had not thereafter returned to active full-time work before his death, the coverage had never become effective. Todd v. Dow Chemical Company, 760 F.2d 192 (8th Cir.1985); Gulf Life Insurance Company v. Hickey, 476 So.2d 762 (Fla.App. 3rd Dist.1985); Carageorge v. Fidelity & Guaranty Life Insurance Company, 345 So.2d 865 (Fla. App. 1st Dist.1977); Williams v. Metropolitan Life Insurance Company, 448 S.W.2d 295 (Mo.App.1969).
Employees of the School Board were bound by the provisions of the booklet. The School Board was made aware of this fact by the terms of the adoption agreement with the State Program as well as through the meetings with Hubert Linscomb. We find the provisions of the booklet and the adoption agreement free from ambiguity. We further find that Mr. Credeur had never been covered by the group life insurance policy underwritten by Continental because he was not actively working on November 1, 1983, and did not thereafter return to active full-time work before his death.
The School Board further contends that either Continental or the State Program was obligated to advise potential plan participants of the deferral provision. It argues that a relevant inquiry should have been made at the time of enrollment, or a question should have been placed on the enrollment form, regarding the present work status of the employee. The State Program booklet contains numerous rules concerning eligibility and benefits which could not be placed on the face of the enrollment form. This is why the rules and benefits booklet was distributed at the time of enrollment.
Continental did not have any duty to employees of the School Board to inform them of any deferral provision. In a policy of group insurance, the contract is between the insurance company and the employer, and the insured employee is only incidentally a party thereto. Carr v. Port Ship Service, Inc., 406 So.2d 632 (La.App. 4th Cir.1981); Watkins v. Metropolitan Life Insurance Company, 174 So. 885 (La.App. 1st Cir.1937). The contract of insurance clearly stated that an employee in Mr. Credeur's situation would not be covered under the policy until he returned to active full-time work. The State Program then fulfilled its duty by communicating this limitation to the School Board and to employees generally through disbursement of its booklet.
In the case of Neider v. Continental Assurance Co., 213 La. 621, 35 So.2d 237 (1948), the Supreme Court held that where there is a group life insurance policy covering its employees, "an employer owes to the employee the duty of good faith and due care in attending to the policy and that the employer should make clear to the employee anything required of him to keep the policy in effect...." In Neider, the employer was, as is usually the case, the holder and administrator of the master policy. The instant case presents us with a situation where another party, the State Program, is the holder and statutory administrator of the master policy issued by Continental. La.R.S. 42:871 C, 42:874 A.
We find, however, that the aforementioned principal of Neider, supra, is applicable to the facts of this case. Mr. Credeur was a janitor with a fourth grade formal education who was more comfortable speaking French than English. He was covered under a group policy when the School Board employees, by a majority vote, decided to dissolve their participation under the group policy underwritten by Pan American and participate in the State Program. See La.R.S. 42:821 B. His employer, the School Board, was apprised of the eligibility provisions under the State Program. The School Board sanctioned *220 and assisted Mr. Credeur's use of sick and annual leave before his retirement. The School Board certified him as an active employee and later changed his status to retired. Prior to this, in June 1983, Mr. Guilbeaux had assured Mr. Credeur that he would continue to be covered by life insurance when he retired. The trial court correctly found that the School Board breached its duty, as set forth in Neider, supra, and as a result, Mr. Credeur assumed he was insured when he in fact he was not.
The evidence indicates that had Mr. Credeur returned to active full-time work for perhaps as short a period as one full day, his life insurance would have become effective. Mr. Credeur also could have converted the group life policy underwritten by Pan American to an individual life policy. Had Mr. Credeur been aware that he was not insured, the evidence shows he could have taken some action to protect his interests.
Plaintiff contends the trial court erred in not applying the doctrine of abuse of rights to prevent Continental from exercising its right to deny death benefits to Mrs. Credeur. The Supreme Court examined the doctrine of abuse of rights in Illinois Central Gulf Railroad Company v. International Harvester Company, 368 So.2d 1009 (La.1979):
"[T]he doctrine is the product of a French jurisprudential and doctrinal movement which has expanded into most of the civil law jurisdictions "to the point of becoming a widely accepted principle of the Civil Law." Cue-to-Rua, Abuse of Rights, 35 La.L.Rev. 965, 967 (1975). See, generally, Catala and Weir, Delict and Torts: A Study in Parallel (Part II), 38 Tul.L.Rev. 221 (1964); Herman, Classical Social Theories and the Doctrine of Abuse of Right, 37 La.L.Rev. 747 (1977); Maynard, Abuse of Rights in France and Quebec, 34 La.L.Rev. 993 (1974); Comment, 7 Tul.L.Rev. 426 (1933). The main body of French case law on abuse of rights is based on article 1382 of the French Civil Code, which is very similar in wording to article 2315 of the Louisiana Civil Code. In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm. See, Cueto-Rua, supra, at 990-91; Catala and Weir, supra, at 222-26. The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. See, Cueto-Rua, supra, at 992-96; Catala and Weir, supra, at 230-34. Protection or enforcement of a right has been denied when the exercise of the right is against moral rules, good faith or elementary fairness. See, Cueto-Rua, supra, at 996-99.
The foregoing principles seem to be the main criteria which have been formulated for applying the abuse of rights doctrine. These tests have met with varying degrees of acceptance in the civil law jurisdictions, and it should be kept in mind that the entire doctrine is in a state of flux. As Professor Cueto-Rua observes:
"* * * The doctrine of abuse of rights is in the making, it is `in fieri.' It is an important juridical-political element of modern civil law doctrine. Although there are still pending important questions concerning its scope as well as criteria for the definition of abusive use of rights, this we may safely say now: it will be difficult for a holder of an individual right, in most of the civil law jurisdictions today, to exercise such right to the detriment of other parties, just for the sheer sake of exercising it. At least a `serious and legitimate interest' will have to be shown in order to justify the exercise of its right."
Plaintiff cites language from Cataldie v. Louisiana Health Service & Indemnity Company, 433 So.2d 367 (La.App. 3rd Cir. 1983) as support for her assertion that the *221 doctrine of abuse of rights is applicable to the facts of this case. The facts of Cataldie differ greatly from those of the instant case and the holding of the court was expressly limited to situations in which an insurer arbitrarily and without just cause terminates a hospitalization policy. Moreover, we find that Continental did not act either arbitrarily or without just cause in denying benefits to Mr. Credeur. Continental had a serious and legitimate interest in denying Mrs. Credeur those benefits. Mr. Credeur had never become eligible for insurance coverage by the terms of both the master insurance policy and the State Program booklet. Allowing Continental to assert their right of denial was not against moral rules, good faith or elementary fairness.
Plaintiff cites Harding v. Metropolitan Life Insurance Company, 188 So. 177 (La.App.Orls.1939) for the proposition that since Continental accepted Mr. Credeur's portion of the policy premium over a period of time without rejecting his application, Continental should be estopped from denying benefits to Mrs. Credeur. She asserts that the trial court erred by failing to apply such an estoppel. We need not discuss in detail the requisites for an estoppel since one of the fundamental elements of estoppel is that the person against whom the estoppel is urged knew or should have known of the facts allegedly forming the basis of the estoppel. Scallon v. Simmesport State Bank, 129 So.2d 49 (La.App. 3rd Cir.1961). The State Program determined the eligibility of School Board employees for coverage under the policy based upon information transmitted to it by the School Board. Continental neither knew nor should have known of Mr. Credeur's status, particularly when the State Program was also unaware of Mr. Credeur's true status. Accordingly, we find the trial court did not err in failing to apply the doctrine of estoppel in this case.
Plaintiff claims that the trial court erred in failing to find that the School Board was the agent of Continental. Plaintiff relies on the holding in Neider, supra, wherein the Supreme Court stated, "In its position as administrator of the policy, we feel also that the employer should be considered as the agent of the insurer, and any omission of duty to the employee in its administration should be attributable to the insurer."
As previously discussed, in Neider, supra, the employer and the administrator of the group policy were one and the same. Here, however, the employer is the School Board while the administrator of the policy is the State Program. The agency relationship found in Neider, supra, was based upon duties performed by the employer as the administrator of the policynot merely upon its position as employer. The State Program must perform varied duties in its role as administrator, including processing all claims and disbursements of all payments to program participants. La.R.S. 42:877. Pursuant to La.R.S. 42:876 A, the State Program sends a monthly invoice premium statement to each employer agency listing the participating employees of the particular agency, the class of coverage, and amount of contribution due. It also establishes the rules and regulations it promulgates in the booklets given to employees and determines the eligibility of employees of agencies such as the School Board.
The School Board was responsible for enrolling its own employees in the State Program. The School Board was required by statute to reconcile the monthly invoice premium statement, collect the employee contributions and remit them together with its own share of the contribution. See La. R.S. 42:876 B. The School Board also mailed change of status forms to the State Program upon Mr. Credeur's retirement and death.
The evidence shows that the School Board's primary duty was to gather information on employees to forward to the State Program and deduct employee contributions. The employee's contribution was remitted to the State Program which used it to pay the premium on its policy. The State Program actually performed the important *222 administrative duties regarding the group life policy.
Authority is split on the issue of the employer as the agent of the insurer. Louisiana and several other jurisdictions adhere to the line of reasoning as set out in Neider, supra. The soundness of such decisions has been questioned, but the result is equitable. See 1 Appleman, Insurance Law & Practice § 43. We feel a holding in this case that the School Board is the agent of Continental would be an unwarranted extension of the holding in Neider, supra. We cited Neider, supra, as authority for finding that under the facts and circumstances of this case, the School Board breached a duty owed to its employee, Mr. Credeur. However, for the above reasons, we distinguish Neider, supra, on the issue of the existence of an agency relationship between the School Board and Continental.
As further support for our holding, we rely on Davidson v. Board of Trustees, State Employees Group Benefits Program, 481 So.2d 708 (La.App. 1st Cir.1985). In Davidson, supra, the issue was whether an agency relationship existed between plaintiff's employer, Southern University, through one of its employees, and the State Program. The case involved group health insurance coverage under the State Program which differs from the group life insurance coverage in that the health coverage is maintained by the State Program itself, and is not underwritten by a separate insurance company as the group life coverage is.
Southern University was required to perform the same statutory duties as is the School Board. Southern's employee misinformed plaintiff concerning his continued insurance coverage following his resignation, assuring him that he would remain covered. Plaintiff was, in fact, not covered, and thereafter incurred medical expenses for which benefits were denied. The appellate court examined the relationship between Southern and its employee and the State Program but found no actual or apparent agency relationship existed.
The instant case presents an even more attenuated relationship than that found in Davidson, supra, and we find that no agency relationship existed between Continental Assurance Company and the Lafayette Parish School Board. Plaintiff cites as further support for his agency theory, Continental's reference to the School Board as its agent in a letter to Mrs. Credeur and the School Board's payment to Mrs. Credeur of $92.40 as reimbursement of that amount deducted from Mr. Credeur's payroll checks as his share of premium contributions. Plaintiff apparently reasons that since the claims representative from Continental wrote, "The refund of premiums paid on this policy will be mailed shortly by our agency," and then the check was received from the School Board, that the School Board was in fact the agent of Continental. We disagree finding plaintiff's argument to be one of form over substance and reiterate our holding that no agency relationship existed between these parties.
Penalties may not be assessed under La. R.S. 22:656 unless there exists a valid policy of insurance under which payments of death benefits were not made within 60 days after the date of receipt of due proof of death unless there was just cause for the insurer's failure to make such payment. We have found that Mr. Credeur was not covered by the insurance policy so this statute is without effect.

DECREE
For the reasons assigned we affirm the judgment of the trial court. Costs of this appeal are assessed against Defendant-Appellant Lafayette Parish School Board.
AFFIRMED.